Argued October 26, 1970, decree affirmed in part, reversed
in part, February 11, 1971

IN THE MATTER OF THE ADOPTION OF
SHERRI LYNN GREEN, AN INFANT.

SMITH ET UX, *Appellants, v.* GREEN ET UX,
*Respondents.*
480 P2d 437

*Harrison R. Winston,* Roseburg, argued the cause and filed the brief for appellants.

No appearance for respondents.

Before Schwab, Chief Judge, and Langtry and Foley, Judges.

LANGTRY, J.

This is an appeal from a decree denying a petition for adoption of a minor child. The petition was based upon the narrow ground under ORS 109.324 of "neglect without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding" the filing of the petition.

The parents of the child were properly served with citation at their domicile in Utah, as required by ORS 109.330, and they appeared by written answer and in person. The answer, *inter alia,* alleged that the child was being wrongfully withheld from them by petitioners, that it is in the child's best interest that she be returned to their custody, and demanded the same.

Evidence was that petitioner wife is an aunt of the natural father of the child, who was born January 29, 1964. Petitioners and the child's parents were domiciliaries of Utah. The women worked together and the men had worked together. The parents were having marital and financial trouble and, as a result, on August 21, 1964, they and the petitioners went to a Utah lawyer and had him prepare a written contract which they all then signed, under which, in consideration of the agreement of the petitioners to support and maintain the child and give her the same love and affection they gave their own children, they placed the custody of the child with the petitioners. The parents agreed that after the child had resided with the petitioners for one year they would "appear in court and give the consent necessary for the adoption of such child." This written contract was received in evidence without objection.

In July or August of 1965, a disagreement arose between petitioner wife and the natural mother, and the latter sought return of the child. The evidence as to time when this occurred is disputed, but from all of the evidence it can be inferred that one year from August 21, 1964, had elapsed. She met resistance and did not take the child. The evidence also is disputed as to the exact time, but about September 5, 1965, according to the most reliable testimony in the record, petitioner wife took the child to Colorado for about two months, and then, taking the child with her, moved to Grants Pass, Oregon, to join her husband. Previous to their Utah residence, all of the parties had resided in the Grants Pass area. Petitioner husband, when he went to Grants Pass in 1965, continued to work for the same man that he and the child's natural father had together previously worked for in the same area.

Petitioners never notified the parents where they had gone. From 1965 until the petition was filed in 1969, they lived continuously in Grants Pass and nearby Glendale. The parents of the child continued to live in Utah. They were frequently in contact with relatives of both couples in Oregon and Utah who knew the whereabouts of each. They visited several times in Oregon during the same years and made no serious effort to locate the petitioners and the child on those occasions, although the circumstances shown in evidence make it apparent that they must have known petitioners were in the Grants Pass area. Obviously, they made no contribution to the child's support. The evidence which we have reviewed, although it is in sharp conflict, fairly supports the findings of the trial court in the following regards:

> "* * * More probably than not Mrs. Smith [petitioner] left [Utah in 1965] to prevent the mother from retaking her child. * * * [T]he court is satisfied from the evidence that had the Greens during the year immediately preceding the filing of the petition seriously undertaken to locate Smiths and their child, they would have in all probability succeeded. * * * [Petitioners] have reared a healthy, happy, contented child. * * * [If] the rule applicable was that of custody in a suit for divorce, i.e., the best interest of the child, the result herein would be different. It does no injustice to the parents to say that after the period of time that has elapsed in this case—here the child has virtually spent the first six years of her life in the home of the petitioners, whose rearing of the child simply cannot be faulted—that it would seem the child's best interest dictates that she remain where she is. She is virtually a stranger to her parents and her brothers and sister * * *."①

---

① In Bodenheimer, *The Uniform Child Custody Jurisdiction*

As an additional finding, although the evidence is conflicting, we think that if the parents had seriously wanted their child back within a year after they made the custody contract, they could have required it. As we have already observed, the most reliable evidence indicates that petitioners waited, after the dispute in July or August 1965, until September 5, 1965, before they left with the child.

The part of ORS 109.324 involved here was interpreted in *Wilcox v. Alexander et ux*, 220 Or 509, 514, 515, 349 P2d 862 (1960). That case holds:

"* * * The requirement that the nonsupport must be without 'just and sufficient cause' denotes

---

*Act: A Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand L Rev 1207, 1208-09, 1212 (1969), the author states:

"Any psychiatrist or psychologist, experienced parent, grandparent, or teacher will state that when there has already been one upheaval in the child's life due to divorce or some other misfortune, the first and foremost requirement for the child's health and proper growth is stability, security, and continuity. Dr. Andrew Watson, psychiatrist and professor of law, has said that stability is 'practically the principal element in raising children, especially pre-puberty ones,' and that 'a child can handle almost anything better than he can handle instability.' Furthermore, Dr. Watson maintains that 'poor parental models are easier to adapt to than ever shifting ones.' Similarly, Dr. Herbert Modlin of the Menninger Foundation stresses the importance of 'constancy of mothering' and describes the characteristics of children in the various periods of preadolescent and preadult existence in which their needs vary somewhat, but there is always the requirement of continuity and a sense of family, satisfying a need to belong.

"* * * * *

"* * * Dr. Watson concludes that custody decisions once made 'should nearly always be permanent and irrevocable' * * *.

"* * * * *

"* * * [O]nly recently have improved communications between law and behavioral sciences led lawyers to question such traditionally ingrained notions as the false premise that children need freely changeable custody arrangements * * *."

an equivalent, if not broader, stricture than 'wilful'. No court would allow an adoption for nonsupport only unless the failure to provide was by intentional, deliberate or wilful design. The language of ORS 109.324 requiring the nonsupport to be 'without just and sufficient cause' is identical to the language of ORS 167.605 which makes it a crime to fail to support a wife or child 'without just and sufficient cause.' It is apparent, therefore, that the legislature intended that the nonsupport be of the same wilful or deliberate character as that defined in the criminal code. See *State v. Francis*, 126 Or 253, 268, 269 P 878 (1928)."

■ The next to the last sentence in ORS 109.324, which was a part of the statute when *Wilcox* was decided, states that in determining whether there has been wilful neglect the court should disregard incidental visits, communications and contributions. This language, to us, casts doubt upon the interpretation placed upon the statute in the language quoted from *Wilcox* above. See Larson, *Trends and Developments in Oregon Family Law: Parental Rights and Child Welfare*, 43 Or L Rev 193, 207-208, 211 (1964). However, we are bound by that interpretation as the trial court was. We affirm the trial court's decree insofar as it denied the adoption.

The decree, pursuant to the demand in the answer, also provides for transfer of custody of the child to the natural parents. This requirement, on motion of petitioners at the suggestion of the trial court, was held in abeyance by this court pending determination of this appeal.

ORS 109.307 (1), which defines the court's authority in adoption proceedings, provides that after hearing the court shall:

"* * * * *

"(a) Enter a final decree under ORS 109.350;

"(b) Continue the guardianship or legal custodial status of the child;

"(c) Remand the child to a court having jurisdiction under ORS chapter 419; or

"(d) Take such other action as the court considers necessary.

"\* \* \* \* \*"

This section of the adoption statutes was enacted in 1965. Apparently, no appellate decision has interpreted it; thus, no cases presently indicate whether continuing the legal custodial status of the child or taking such other action as the court considers necessary encompasses authority to transfer physical custody as the court ordered in the case at bar. Regardless, we think that the issues involved in deciding whether such custody should be transferred were not adequately presented to the court for it to rule on the question.

In *Omlie et ux v. Hunt*, 211 Or 472, 316 P2d 528 (1957), a case with facts somewhat similar to those here, grandparents had physical custody of their deceased daughter's children, and petitioned for adoption on the ground the father had wilfully deserted them. The father objected and the petition was denied, but the court refused to give him physical custody, saying:

"If it is contended that \* \* \* [the father] is not a fit person to have custody of his children, that question can be determined in a proceeding which directly raises the issue. cf. *Larson v. Wellner*, 97 Or 513, 191 P 671."[2] 211 Or at 487.

[2] In Simons et ux v. Smith, 229 Or 277, 281, 366 P2d 875 (1961), a case not in point on the facts, the Oregon Supreme Court said:

"\* \* \* Indeed, the denial of an adoption petition has no necessary bearing on the physical custody of the child \* \* \*."

In *Dugger et ux v. Lawless*, 216 Or 188, 338 P2d 660 (1959), the Oregon Supreme Court said with reference to the question of whether natural parents are to be allowed to resume control of the child after a consent to adopt is withdrawn:

> "In exercising its discretion the trial court is to be guided by the principle that the child's welfare overrides all other considerations * * *." 216 Or at 198.

In the case at bar the issue of fitness to have custody of the child was raised by the answer, and evidence of fitness was received. We have quoted the trial court's findings based on this evidence. However, the issues of adoption or custody based on the contract were neither properly raised by the pleadings nor presented to the court by counsel in brief or argument.

██ As we have noted, the contract in the case at bar required the natural parents, after one year of performance, to consent to adoption. There was substantial evidence that, although the child's mother tried once either immediately before or after elapse of one year to take the child back, one year of performance did elapse without the parents making any serious or sustained effort to revoke the contract. There is no doubt that petitioners performed for the full year, and much longer. The contract was made in Utah by domiciliaries of Utah and it obviously was intended to be completed under Utah law. In *Schultz v. First Nat. Bk. of Portland et al*, 220 Or 350, 359, 348 P2d 22, 81 ALR 2d 1121 (1959), it was held, with reference to a contract to adopt made in another state, that Oregon will enforce the contract if valid where made, even though such a contract is not valid under Oregon law:

In *In Re Williams' Estates,* 10 Utah 2d 83, 348
P2d 683 (1960), the Utah court said:

· "* * * [W]here a child's parents agree with
the adoptive parents to relinquish all their rights
to the child in consideration of the adoptive par-
ents' agreement to adopt such child, and to care
and provide for it the same as though it were
their own child, *and such agreement is fully per-
formed by all parties connected with such contract
except there is no actual adoption, the courts will
decree specific performance of such contract* and
thereby award to the child the same distributive
share of the adoptive parents' estate as it would
have been entitled to had the child actually been
adopted as agreed * * *." 10 Utah 2d at 85.⑨
(Emphasis supplied.)

The opinions in *Dugger* and *Schultz* read to-
gether, make it obvious that the Utah decision in
*Williams* is not in conflict with the public policy in
Oregon. Therefore, the facts of the case at bar, con-
sidered in the light of the cases discussed above, in-
dicate it is quite possible that specific performance of
the contract to adopt may be decreed under the law of
Utah, or that the natural parents will be estopped from
objecting to a statutory adoption based upon Utah law.
This question, and the intertwined question of physical
custody of the child can be determined only in a pro-

⑨ See Bower v. Landa, 78 Nev 246, 371 P2d 657, 94 ALR 2d
1232 (1962), a case in which the Nevada Supreme Court gave full
faith and credit to a Utah probate court decree which, after
*Williams,* and based upon it, gave effect to a contract to adopt by
declaring the child to be the equitably adopted child of the adop-
tive parents.

In Re Adoption of D.............., 122 Utah 525, 252 P2d 223 (1953),
and Miller v. Miller, 8 Utah 2d 290, 333 P2d 945 (1959), hold that
a consent to adopt acted upon in good faith by the adopting
parents raises estoppel against the natural parents if they attempt
to withdraw the consent.

ceeding in which the issues are properly presented and tried.

The decree denying the adoption is affirmed. That portion of the decree which transfers custody of the child to the natural parents is reversed.