Argued April 28, affirmed May 27, 1975

IN THE MATTER OF THE ADOPTION OF JOHN LEE BOSLEY.

BROOKE ET UX, *Respondents, v.*
BOSLEY (No. A-23546), *Appellant.*

536 P2d 543

*James W. McClurg,* Portland, argued the cause for appellant. With him on the brief were. Kennedy & King, Portland.

*Frank Pozzi,* Portland, argued the cause for respondents. With him on the brief were Pozzi, Wilson & Atchison and Raymond J. Conboy, Portland.

Before SCHWAB, Chief Judge, and LANGTRY and TONGUE, Judges.

## LANGTRY, J.

Dr. Larry Bosley, the natural father of John Lee Bosley, appeals from a decree providing for adoption of that child by John R. Brooke. Elizabeth M. Brooke, wife of John R. Brooke, is the child's natural mother. The child is now almost nine years of age. Mrs. Brooke and Dr. Bosley were divorced in 1969 when the child was three years of age, the decree providing for joint child custody, although Mrs. Brooke has had uninterrupted physical custody. She and Mr. Brooke were married in 1970. The trial court in a letter memorandum after an extensive, contested hearing made the following findings:

"1. That Dr. Bosley wilfully neglected without just and sufficient cause to provide proper care and maintenance for his son, John Lee Bosley, for one year next preceding the filing of the Petition

for Adoption herein. Dr. Bosley's conduct in this regard was intentional.

"2. That any visitations, communications or contributions made by Dr. Bosley during the period one year next preceding the filing of the Petition for Adoption herein were incidental and should be disregarded by the Court in determining whether Dr. Bosley wilfully neglected without just and sufficient cause to provide proper care and maintenance for his son.

"3. That the consent of Dr. Bosley to the Petition for Adoption herein should not be and is not required.

"4. That the Petition for Adoption herein should be allowed.

"* * * * *

"Counsel urged the Court to consider Dr. Bosley's sincerity in contesting the Petition for Adoption. The record simply does not support a finding that Dr. Bosley has evidenced anything other than the most casual interest in his son during the past several years. His contacts with the boy have been minimal and superficial. They lacked any evidence of genuine concern or solicitude. After hearing the testimony and having examined the exhibits, the Court concludes that since 1970, and up to the present time, Dr. Bosley's paramount concerns have been to stabilize and improve his financial position and the pursuit of his own personal pleasure. His few spasmodic and perfunctory contacts with his son simply fall short of the kind of interest required in a case such as this.

"* * * * *"

■■ Father contends that the evidence does. not support the finding that he wilfully neglected his son within the meaning of ORS 109.324. This is his main contention, but he also contends there was error in that the trial court, over objection, heard testimony by a psychiatrist regarding the best interests of the

child and in that the court erred in placing the burden of proof upon the father. With reference to the latter two contentions, we dispose of them here simply by stating that even if, as an abstract legal proposition, testimony with reference to the best interests of the child is not relevant where the principal question is whether the natural parent's rights should be terminated because of that parent's derelictions, there was no error in hearing the psychiatrist's testimony in this case. The psychiatrist testified that he had interviewed the child in question and that he thought the best interests of the child would be served by the child's continuing in the present home and being adopted by Mr. Brooke. Father's counsel had already stipulated that Mr. and Mrs. Brooke were fit and proper persons to have custody of the child. Under these circumstances, we can see no prejudice even if the testimony is minimally relevant, which is a question we do not decide.[1] With reference to the burden of proof question, there is nothing we find in the record that we think supports the father's contention. The petitioners for the adoption put on their case first, supporting the allegations of their petition. Father then put on his answering case and petitioners rebutted. The court's

---

[1] In Moody v. Voorhies, 257 Or 105, 109-10, 475 P2d 579 (1970), the Oregon Supreme Court said:

> "The best-interest-of-the-child rule, as applied in determining custody, is applicable to adoptions, but it cannot be considered without the consent required by ORS 109.314, or by a judicial determination that the necessity of consent is obviated * * *.

> "* * * [T]he fact that the adoptive parent may be able to provide an environment [good for the child] * * * is not relevant, until the criteria of ORS 109.324 have been met."

We are unwilling to rule that this language means that a trial judge hearing an adoption case as in equity has committed reversible error by hearing some evidence concerning best interests of the child. We assume the trial court gave consideration, if at all, to the challenged testimony only in accord with the language of Moody v. Voorhies, supra. In our de novo review here, that is what we do, in any event.

holding was inherently that petitioners had sustained their burden of proof.

■ The evidence, as briefly as we can understandably review it, was that the child's father, Dr. Bosley, had been married before his marriage to Mrs. Brooke and that he had a daughter by that marriage. From some period of time in 1970 or early 1971 he had not paid court-ordered support for that child although her mother had financial need of the support money. Over a long period of time prior to 1970, and continuing thereafter, Dr. Bosley had shown meager interest in that child.

Dr. Bosley had paid support prior to 1970 for his son, who is the subject of this petition, but had done so irregularly even though the payments were required by the decree of divorce. In late 1970 he ceased making payments and nothing was paid by him until well after the petition was filed in this case in June 1973. He has not visited the child since July 1970. By his own testimony he has written his son "[a]s few as four or five and as many as ten or 12" times. He has sent the child three or four gifts in that time.

As excuse for these manifestations of disinterest in the child, Dr. Bosley relates that while he was in medical practice in California he became involved in stock market operations prior to 1970. It is hard to understand from his testimony exactly what his net worth might have mounted and descended to. His testimony in this regard was:

"A The high was approximately $1.8 million net worth.

"Q That was the value of the securities, less debts?

"A The gross value of all my holdings, not the holdings against them."

With a decline in the stock market, he said that by

the summer of 1970 "* * * I was about $600,000 below zero, in the red, in debt." At another place in his testimony he said, "* * * I was in debt some four or five or six million dollars in the market * * *." His brother, who was his business manager, testified that Dr. Bosley was against taking bankruptcy and sought to avoid being forced into involuntary bankruptcy. The method he selected for doing this was to sell his medical practice for $60,000 and other liquid assets available to him for $90,000. He took this $150,000 in cash and went to Europe, with his new wife, concealing his destination and address there. There, he testified that he expected to make investments from which he could "balloon" the money he had into enough to pay off his debts. He remained there until several months before the petition was filed in this case (June 1973) and then, having used up virtually all of the money he had taken with him without having had any substantial earnings, he returned to California to begin medical practice anew.

From the time he left in late 1970 until January 1972 he made no contact of any kind with Mrs. Brooke or his son. A present from him arrived for the son in January 1972. A return address thus became available and Mrs. Brooke corresponded with Dr. Bosley on several occasions in the ensuing year and one-half. Her letters carried sharp reminders to Dr. Bosley that he was utterly failing in his financial and other fatherly obligations to his son. She sent Dr. Bosley pictures of the boy, and some of his early school drawings. Dr. Bosley wrote several letters to his son which Mrs. Brooke read to him. Dr. Bosley suggested at one time that the son be sent to him in Europe for a visitation, which Mrs. Brooke refused to allow. Dr. Bosley did not suggest in his communications who should pay for the visitation.

During the years prior to the contact in Janu-

ary 1972 and continuing until he returned to start practice anew, Dr. Bosley was several times on trips within the United States and sometimes relatively close to Oregon but he did not make any telephone call to or visitation with his son. His explanation is that he was afraid that if he made such an effort it would result in his being jailed for his failure to make court-ordered support payments. He said this was on his attorney's advice. Further, he contends that if there had been any reason to fear that the child was not being properly cared for he immediately would have taken steps to remedy the situation. Dr. Bosley states that he was aware that Mrs. Brooke is a wealthy woman and an excellent mother, hence, there was no need to fear for adequacy of financial or emotional care for the child.

When Dr. Bosley returned to practice in California, he still made no contact with his son nor did he provide any knowledge thereof to Mrs. Brooke, who continued to believe he was in Europe. By the time the petition was filed in June 1973, he had apparently begun to receive substantial sums of money again for he testified that he had $18,000 in cash in a safety deposit box in California. He made arrangements to start paying support (well after the time the petition was filed) and was able to supply $20,000 in stocks as collateral in support of an agreement to pay a substantially scaled-down sum on current support and delinquencies.

ORS 109.324 provides:

"If either parent is believed to have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption and such parent does not consent in writing to the adoption, there shall be served upon such parent a citation in accordance with ORS 109.330 to show cause why the adoption

of the child should not be decreed. Upon hearing being had, if the court finds that such parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption, the consent of such parent at the discretion of the court is not required and, if the court determines that such consent is not required, the court shall have authority to proceed regardless of the objection of such parent. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions * * *."

This language was incorporated in the statutes by Oregon Laws 1957, ch 710, § 7, and it was construed in 1960 by the Oregon Supreme Court in *Wilcox v. Alexander et ux,* 220 Or 509, 514-15, 349 P2d 862 (1960):

"The 1957 statute gave the courts greater latitude in allowing an adoption over the objections of a nonconsenting parent. It is, of course, significant that to overcome nonconsent it was no longer necessary to prove both wilful desertion *and* neglect to support. This was the criteria required before the 1957 act. *Omlie et ux v. Hunt,* 211 Or 472, 316 P2d 528 (1957). The 1957 act now allows the court to proceed when either wilful desertion or neglect to support without cause is established * * *.

"* * * * *

"* * * The requirement that the nonsupport must be without 'just and sufficient cause' denotes an equivalent, if not broader, stricture than 'wilful'. No court would allow an adoption for nonsupport only unless the failure to provide was by intentional, deliberate or wilful design. * * * It is apparent, therefore, that the legislature intended that the nonsupport be of the same wilful or deliberate character as that defined in the criminal code * * *."

*See also Thies v. Barnes,* 11 Or App 158, 501 P2d 1305 (1972); *State ex rel Juv. Dept. v. Draper,* 7 Or App 497, 491 P2d 215 (1971), Sup Ct *review denied* (1972).

In the latter case we said:

"The common theme that exists in criminal nonsupport cases as well as adoption and termination proceedings is that a parent must do 'the best he can.'" 7 Or App at 506.

That Dr. Bosley was well aware he was not measuring up to this standard is shown by his testimony that he was afraid of the quasi-criminal sanctions that could or would be visited upon him because of the same dereliction of duty to his son that threatens to end his parental rights now.

He argues that, because Mrs. Brooke is financially well off and an excellent mother, his own derelictions must not be held to militate against him, for he knew the child would be well cared for regardless of his actions. In this connection he cites us cases such as *Smith v. Green,* 4 Or App 533, 480 P2d 437 (1971), where an adoption was denied because the derelict parents knew the child would be well cared for. The situation in *Smith v. Green,* supra, is distinguishable from that here. As was pointed out in *State ex rel Juv. Dept. v. Draper,* supra, the parents in *Smith v. Green,* supra, had made a contract with the prospective adoptive parents for the child's care. Nothing of that nature exists here.

■ To argue as Dr. Bosley does in this regard is to say that his conduct must be weighed in a different scale than that of the father of the child whose custodial mother is in moderate or poor financial circumstances. This argument is illogical and should avail him little. While relative financial conditions are an element for consideration as to "just and sufficient cause," the whole central question is whether for one

year preceding the filing of the petition the nonconsenting parent wilfully and intentionally neglected without just and sufficient cause to provide proper care and maintenance.

Sufficient evidence is present to support the finding. The father had money available. He had sharp warnings that he was grossly delinquent in all of his parental duties. He failed under these circumstances to not just one but two of his children. His intention about child neglect can be inferred from evidence of his failure toward his other child, whose mother is not well off financially. It also can be inferred from the other evidence we have reviewed. Finally, his own unbelievable testimony about his financial dealings and condition throws his entire credibility into question.

In *Wilcox v. Alexander et ux,* supra, 220 Or at 519, the Oregon Supreme Court said:

"The record has been examined with care. In the final analysis, however, we must be much guided by the findings of the able trial judge. In matters of this nature, involving the most basic human values and emotions, the character of the witness and the meaning of his testimony can best be gleaned from the demeanor and apparent sincerity of the witness * * *."

We find no reason in the record or the arguments made to us that leads us to disagree with the trial court's decree.

Affirmed.