Argued May 23, affirmed August 4, reconsideration denied
September 17, petition for review denied October 14, 1975

In the Matter of the Adoption of
Kimberly Kay Brown and Richard Lyle Brown
(No. 361),

and

In the Matter of the Application of
Clayton Leonard Brown (No. 7060),
for a Writ of Habeas Corpus.

BROWN, *Respondent, v.* TAYLOR et ux,
*Appellants.*
538 P2d 1268

*M. D. Van Valkenburgh,* The Dalles, argued the cause for appellants. With him on the brief were Heisler & Van Valkenburgh, The Dalles.

*Gene A. Killeen,* Portland, argued the cause for respondent. With him on the brief were Solomon, Warren, Killeen & Kirkman, Portland.

Before Schwab, Chief Judge, and Foley and Fort, Judges.

FORT, J.

These matters essentially turned upon the problem of adoption without parental consent, and arose out of two proceedings which were consolidated for trial. In the first, Thelbert Reed Taylor, hereinafter referred to as Reed Taylor, and his wife, Carol Taylor, petitioned for the adoption of two minor children, Richard and Kimberly Brown. Reed Taylor had been married for about 11 months to the natural mother of the children, Darlene Taylor, prior to her suicide in 1973. The natural and lawful father of the children, Clayton Leonard Brown, hereinafter referred to as Leonard Brown, refused to consent and countered by filing a petition for a writ of habeas corpus for the children.

Following a trial during which extensive testi-

mony was taken, the trial court denied the Taylors' petition for adoption and allowed the father's petition for habeas corpus. The Taylors appeal both the denial of the petition for adoption and the grant of the writ of habeas corpus. There is no cross-appeal by the father in either case.

Leonard Brown, respondent herein, married Darlene in 1958. There were two issue of that marriage —Richard, born in 1961, and Kimberly, born in 1965.

The marriage terminated in 1968 pursuant to a Multnomah County divorce decree initiated by Darlene Brown. Mr. Brown, although represented by counsel, made no formal appearance. Custody of the children was awarded to Darlene Brown. No visitation rights were granted the father in the decree.

From the time of filing of the divorce suit onward, Darlene Brown made continuing affirmative efforts to secrete the whereabouts of herself and the children from Leonard Brown, contending she was afraid of him. Indeed, the divorce decree provided that her address was to be disclosed only to the court. During telephone conversations with Mr. Brown's mother over the years, she consistently refused to disclose her whereabouts. On one occasion, she specifically requested that a mutual friend of herself and Mr. Brown not disclose her whereabouts to him. On another occasion, she became very agitated after a chance meeting with another mutual friend, for fear that he would reveal to Mr. Brown the city of her residence.

Moreover, Darlene Brown on several earlier occasions threatened to shoot or kill Mr. Brown. There is evidence that Mr. Brown took these threats seriously. For two years prior to her death Darlene had been under the care of a physician for a psychoneurotic condition.

The 1968 divorce decree also ordered Leonard Brown to pay child support in the amount of $50 per month per child, but did not set out the precise manner of payment or state that the monies were to be paid to the court. Mr. Brown never made any child support payments. Darlene Brown made no effort to secure support from her former husband, other than as required to give necessary information in the process of applying for welfare assistance. There is no evidence that the welfare agency did however contact him. She affirmatively refused aid from Mr. Brown during the divorce proceedings and in later telephone conversations with his mother.

Darlene Brown remarried in June 1968 and was divorced from that husband in 1970. Her second remarriage in January 1973 was to Reed Taylor, one of the appellants herein. She took her own life in December 1973. Shortly thereafter Reed Taylor married his present wife Carol in April 1974. They are providing a satisfactory home for Richard and Kimberly Brown in Odell, Oregon.

Leonard Brown moved to California shortly prior to the divorce decree in 1968 and has resided there ever since. He married his present wife in September 1971. Her 15-year-old daughter lives with them. During this period, he has at all times been regularly employed and has had adequate income to support his natural children. He also during this time raised two children by a prior marriage to their adulthood.

Mr. Brown did not see or communicate with Richard and Kimberly from the time of the divorce decree until April 1974—a period of some six years. His efforts to locate Darlene and the children were characterized by the trial judge as follows:

"* * * I feel that your efforts to find the children were very very minimal. Maybe I say

that in hindsight, maybe it is because I am aware of a lot of ways of finding people that you are not * * *. I think the fact once their mother died that you took immediate efforts to exercise certain rights is evidence that can be considered in your favor together with the other minimal efforts that you have made * * *."

These "minimal efforts" included · numerous long distance phone calls to friends and acquaintances in the Portland area, numerous long distance phone inquiries by Mr. Brown's mother, inquiries made by friends and relatives who came to Portland, and inquiries made by Mr. Brown himself during a week-long visit to Portland in 1972 made in an effort to try to locate the children.

■ The petitioners' adoption petition was filed pursuant to ORS 109.324. That section provides:

"If either parent is believed to have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption and such parent does not consent in writing to the adoption, there shall be served upon such parent a citation in accordance with ORS 109.330 to show cause why the adoption of the child should not be decreed. Upon hearing being had, if the court finds that such parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption, the consent of such parent at the discretion of the court is not required and, if the court determines that such consent is not required, the court shall have authority to proceed regardless of the objection of such parent. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may dis-

regard incidental visitations, communications and contributions. This section does not apply where consent is given in loco parentis under ORS 109.316 or 109.318."

In *Dunne v. McCashum,* 13 Or App 66, 70-71, 508 P2d 821 (1973), we observed:

"Neglect, to be 'without just and sufficient cause,' must be 'intentional, deliberate or wilful.' *Wilcox v. Alexander et ux,* 220 Or 509, 515, 349 P2d 862 (1960). That is, the failure to provide support and care must be voluntary and knowing.

"The cases do not precisely delineate the quantum, or type of neglect which will satisfy the statute and obviate the necessity of obtaining the parent's consent to the adoption. Such an accurate definition is probably impossible.

"Under our statute a petitioner is not required to prove that the respondent parent intended to abandon all parental rights. *See, State ex rel Juv. Dept. v. Draper,* 7 Or App 497, 491 P2d 215 (1971), Sup Ct *review denied* (1972). The cases focus on certain minimal expressions of concern, which, if present, indicate that the parent has not neglected the child within the meaning of ORS 109.324.

"For example, this court has previously denied adoptions when the objecting parent has frequently visited the child, see *Eacret v. Dews,* 10 Or App 511, 500 P2d 481, Sup Ct *review denied* (1972), or where the parent *at least* knows who is keeping the child, and that the child is receiving adequate care. *See, State ex rel Juv. Dept. v. Mack,* 12 Or App 570, 507 P2d 1161 (1973); *Drake v. Drake,* 8 Or App 57, 491 P2d 1203 (1971), Sup Ct *review denied* (1972); *Smith v. Green,* 4 Or App 533, 480 P2d 437 (1971)." (Emphasis theirs.)

We recently applied ORS 109.324 in a factual context of some similarity to the present case in *Mahoney v. Linder,* 14 Or App 656, 514 P2d 901 (1973). There, as here, a stepfather sought to adopt the two

minor children of his wife and her former husband. The evidence was unequivocal that the natural father had neither visited nor supported the children for more than the statutory one-year period. Nevertheless, this court upheld the trial court's denial of the petition for adoption in the face of the natural father's objection. That decision turned on the existence of an agreement between the natural mother and natural father whereby, in exchange for the father's nonexercise of his visitation rights, the mother would not insist on support payments. We stated:

"When, as here, the failure to contribute to the support of the children, and the failure to exercise visitation rights during the required one-year period may reasonably be considered to be the result of the custodial parent's direct inducement to the noncustodial parent, we cannot say that the conduct here by the father was not without just and sufficient cause. * * *" 14 Or App at 669.

In the case at bar, the natural mother's "inducement" to the natural father, Mr. Brown, to forebear from exercising parental rights and duties was considerably stronger than in the *Mahoney* case—i.e., her active secretion of the children coupled with her unveiled and repeated threats of death to Mr. Brown should he come near. Nevertheless, Mr. Brown made affirmative although not extensive efforts to locate his former family and offer them support.

■ Petitioners devote much time and energy to arguing, in effect, that the "best interests" of the children would be served by granting the petition of adoption, pointing in particular to the strong preference of the children for remaining with them. We do not find it necessary here to reach that question because it is well settled by our Supreme Court that, before a court can weigh such interests, it must first find that

the necessity of parental consent is obviated by satisfying the requirements of ORS 109.324. *Moody v. Voorhies*, 257 Or 105, 475 P2d 579 (1970); *Simons v. Smith*, 229 Or 277, 366 P2d 875 (1961); *Mahoney v. Linder, supra.* Moreover, we note that the trial judge carefully considered in his opinion the psychological repercussions to be anticipated from the turbulent past living experiences of these children and from the projected change of custody to their father, and provided protection therefor in the order appealed from in the habeas corpus case.

The right of a natural and lawful father to the custody of his children following the death of the mother is stated at Annotation, 128 ALR 989, 990 (1940), as follows:

> "It is a general rule that where the custody of children is granted to their mother by a decree of divorce, such custody does not forever cut off and bar the father's right to their custody so long as the decree is unmodified, but only establishes the right of custody between the two spouses during their lives, and that upon the death of the mother her right does not descend nor can it be transmitted, but that the right of the father to the custody of the children is revived, provided, of course, he is a person suitable for the custody of the children."

The Oregon Supreme Court in Ex Parte Barnes, *Barnes v. Long,* 54 Or 548, 550, 104 P 296, 25 LRA (ns) 172 (1909), stated:

> "In the decree of divorce, the custody of the child was given to the wife, and properly so, notwithstanding she was the party at fault, such fault not reflecting upon her character, and the child being of tender age. But the law recognizes the father, the mother being dead, as the rightful custodian of his child, as against the claim of all persons. Of course, the court in the interest of the child may take it from the parents and make other

provisions for it, but there must be some good cause for so doing. No doubt the defendant would give the child a good home and the best of care, and is very much attached to it, but as against the father she has no legal claim upon it. *Swarens v. Swarens* (Kan.), 97 Pac. 968. If the father were unworthy or incapable of caring for it properly, then it would be the duty of the court to place it elsewhere, but no plea of that character is made here. The divorce suit has not relieved petitioner of his parental obligation to his son, and he has done no act that forfeits his right to its custody. It is said in *Jackson v. Jackson,* 8 Or. 402, that, as between the father and maternal grandfather of a child, the father certainly has the better right to its care and custody, unless he is manifestly an improper person to take charge of it * * *."

More recently in *Gheen v. Gheen,* 247 Or 16, 19, 426 P2d 876 (1967), the court again discussed at length the right of the natural parent to custody of a child as against a grandparent or third person and concluded:

"This court has consistently held that in the event of divorce, unless it be clearly shown that both parents are either incompetent or unfit, the natural right of the parent to the care and custody of minor children should not, except for most cogent reasons, be denied in favor of third persons, including grandparents * * *"

*Cf.,* Katz, *Foster Parents Versus Agencies,* 65 Mich L Rev 145, 151 (1966). *See: Yost v. Phillips,* 21 Or App 464, 535 P2d 94 (1975); *Dieringer v. Heiney,* 10 Or App 345, 351-52, 497 P2d 1201 (1972); Annotation: 31 ALR3d 1187 (1970), 30 ALR3d 290 (1970), 29 ALR3d 366 (1970), 25 ALR3d 7 (1969).

We agree with the trial court in its findings in the habeas corpus case that the evidence here fails to disclose such "cogent reasons" as to warrant deny-

ing to the natural father the custody of these two children.

Affirmed.

FOLEY, J., dissenting.

ORS 109.324, quoted in the majority opinion, delineates the criteria under which the necessity for noncustodial parental consent for adoption is determined. The necessity for parental consent is obviated, at the discretion of the court, if the natural parent in question has "wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption * * *." The trial court found that the father was divorced by the mother of the children May 22, 1968, and the custody of the children was awarded to the mother. Neither the father nor his counsel made any effort to secure specific visitation privileges and no visitation was provided in the decree. At no time subsequent to the divorce did the father attempt to secure visitation privileges through court action or with the assistance of counsel. Although the decree required payment of $50 per month per child by the father, no child support payments have ever been made by the father who, the court found, was well able to pay support for the children. The trial court found that the mother made affirmative efforts to keep the children's and her location unknown to the father, and communicated threats of bodily harm to him if he attempted to intrude into their lives. She lived in several locations in Portland following her divorce from the father and later lived in Cascade Locks, Mosier and Hood River, all in Oregon. Although the father contends that he made numerous, regular and consistent efforts to determine the whereabouts of his children, his lack of success renders his claimed ef-

forts questionable. As the trial court said in announcing its decision:

> "* * * Mr. Brown, this is for you—I feel that your efforts to find the children were very very minimal. * * *"

The facts are that Mr. Brown had not seen, visited or communicated with the children for a period of approximately six years—from the date of the decree in 1968—until the children were brought into court on a habeas corpus proceeding in April 1974.

The children are now approximately 10 and 13½ years of age. It is my conclusion from a review of the entire record that the neglect of the father to make a serious effort to locate, visit and provide for his children over a six-year period was so gross that his consent to adoption of the children is not required. I conclude that the requirements of ORS 109.324 are here met. *Brooke v. Bosley,* 21 Or App 537, 536 P2d 543 (1975); *Moody v. Voorhies,* 257 Or 105, 475 P2d 579 (1970); *Mahoney v. Linder,* 14 Or App 656, 514 P2d 901 (1973).

That would then place squarely before the court whether the proposed adoption is in the best interests of the children. While the wishes of the children are only one criteria in making that determination, their strong desire and the basis therefor are entitled to serious consideration.

The trial court talked to the children in chambers in the presence of counsel. After an excellent explanation by the court of the trial court's difficult role, the court came around to asking the 13-year-old boy what his desires were. The boy firmly and unequivocally stated that he wanted to live with the proposed adoptive parents with whom he and his sister had been living the past year and ten months. When the court asked him why he did not want to

live with his father and why he did not like him, he said:

> "He beat me and he beat my mom up, he was just cruel to everybody,"

and commenting upon a recent visit in the home of the father and the father's present wife he said:

> "* * * I hate them."

The girl, then nine years old, also testified that she wanted to live with the adoptive parents.

Since the trial court found that the father's consent was necessary to the adoption, the court did not come to a consideration of adoption and the complex questions which arise in determining what is best for the children, having in mind stability and continuity of relationships, surroundings, environmental influence, emotional attachments, and the other factors to be considered in the placement of children of the ages involved here. For the reasons set forth above, I would reverse the trial court and enter an order denying the writ of habeas corpus. I would remand for consideration by the trial court of placement of the children under the guidelines for adoption.