Argued and submitted May 28, reversed and
remanded December 15, 1982, reconsideration denied January 21,
petition for review allowed March 1 (294 Or 569)
See 295 Or 112, 663 P2d 769 (1983)

In the Matter of the Adoption of
Emily Louise Gibson and Robert
Kent Gibson, minor children.

STREET et al,
*Appellants,*

*v.*

GIBSON,
*Respondent.*

(No. 1181, CA A22688)

655 P2d 604

S. David Eves, Corvallis, argued the cause for appellants. With him on the brief was Ringo, Walton & Eves, P.C., Corvallis.

J. Alfred Joiner, Corvallis, argued the cause and filed the brief for respondent.

Before Thornton, Presiding Judge, and Van Hoomissen and Rossman, Judges.

ROSSMAN, J.

Thornton, P.J., dissenting.

## ROSSMAN, J.

In this adoption proceeding, mother and stepfather, petitioners, contend that consent by the biological father, respondent, is not required, because he has either (1) wilfully deserted his two minor children or (2) wilfully neglected them without just and sufficient cause for one year next preceding the filing of the petition for adoption. ORS 109.324. The trial court found against mother and stepfather on both grounds and ordered the adoption petition dismissed. They appeal. We reverse and remand.

### JURISDICTION

■ The original notice of appeal in this case stated that "Appellant hereby gives Notice of Appeal" without identifying the appealing party or parties by name. The notice did include "[t]he names, regular mailing addresses and telephone numbers of the attorneys for the respective parties," who were identified as "PETITIONERS" and "RESPONDENT." Attached to the notice was a copy of the judgment order in which Robert W. Gibson, the biological father, is identified as the "Respondent" in the adoption proceeding; the "petitioners" are not named in the order, although both are named in the petition for adoption. The briefs on appeal named only one appellant, Louise Gibson Street. Accordingly, we addressed the following questions to counsel:

(1) Is the notice of appeal sufficient in view of the provisions of ORS 109.310(1), ORS 109.370 and ORS 19.029?

(2) Is Robert D. Street an indispensable party to this appeal?

(3) Does the court have jurisdiction to decide this appeal?

Having reviewed the matter and considered the arguments of counsel, we conclude that this court has jurisdiction to decide the merits of this appeal.

Mother and stepfather were petitioners in the adoption proceeding below. *See* ORS 109.310(1).[1] Their

---

[1] ORS 109.310(1) provides:

petition was dismissed. In that context, it is reasonable and appropriate to construe the notice of appeal to state that "Appellant[s] hereby [give] notice of appeal" and that the appellants are Louise Gibson Street and Robert Street, mother *and* stepfather. That construction is consistent with petitioners' intent. Counsel for mother and stepfather and Robert Street himself have furnished the court affidavits asserting that it was intended that Robert Street be a party to the appeal and that the failure to refer to him in the notice of appeal was inadvertent, the result of a scrivener's error.[2] The question to be decided on appeal is the same in either case, and it cannot be said that any defects in the notice of appeal have prejudiced respondent. Finally, we note that ORS 19.130(1) provides that:

> "Upon an appeal, the court to which the appeal is made may affirm, reverse or modify the judgment or part thereof appealed from as to any or all of the parties joining in the appeal, and may include in such decision any or all of the parties not joining in the appeal, except a codefendant of the appellant against whom a several judgment might have been given in the court below; and may, if necessary and proper, order a new trial."

## THE MERITS

The children's parents were divorced in Virginia in 1975. A "Stipulation Agreement" entered by them provided, in pertinent part:

> "The Wife will have the care and custody of the infant children born to the marriage, to-wit: Robert Kenton Gibson and the child not yet born, with the right of Husband to visit the children during two (2) separate two (2) week periods during the Summer, with the understanding that the Husband will be able to bring the child (children) to the State of Virginia.
>
> "* * * * *

---

"Any person may petition any court having probate jurisdiction or, if the circuit court is not the court having probate jurisdiction, the circuit court if its jurisdiction has been extended to include adoption matters pursuant to ORS 3.275 for leave to adopt another and, if desired, for a change of the other's name; but the prayer of the petition by a married person shall not be granted unless the petitioner's spouse joins therein."

[2] We have allowed petitioners' motion for leave to file an amended caption on the notice of appeal to reflect that intent.

"Husband will pay to the Wife $400.00 per month child support for twelve (12) monthly payments after which time he will pay $375.00 per month until the child (children) born to the parties becomes emancipated or finishes college, whichever occurs last. Husband also agrees to pay the expenses for the child's (children's) college education, including tuition and living expenses."[3]

At that time, they had a four-year-old son, Ken, and mother was pregnant with a daughter, Emily Lou, who was born in Roseburg, Oregon, in 1976. Father has never seen his daughter, nor has he ever asked or attempted to do so. He has seen his son only once since the dissolution. That occurred in 1976, when mother took the boy to Virginia. Father made no child support payments from January, 1977, until May, 1981, approximately one month after the petition for adoption was filed. Both parents have remarried. Mother, stepfather and the two children have lived at the same address in Corvallis since May, 1977. Father has known that address since 1977. He still resides in Virginia and has a stepson and an infant daughter from his present marriage.

On appeal, mother and stepfather contend that the trial court erred in finding that father did not wilfully desert his minor children and had not neglected them without just and sufficient cause. The controlling statute is ORS 109.324.[4] It is written in the disjunctive: On finding

---

[3] The agreement purported to be "* * * IN ACCORDANCE WITH SECTION 20-109 OF THE 1950 CODE OF VIRGINIA" and further provided that:

"The parties agree that this Stipulation is to be submitted to the Circuit Court of Buchanan County, Virginia, for confirmation, ratification and approval, and that the terms of same will be made a part of any Decree the Court may herein enter."

Father testified that the parties were divorced in 1975 and that the divorce became final in 1976. On appeal, mother and stepfather explain that a "decree was entered on October 6, 1975, awarding [her] a divorce *a mensa et thoro*" and that "on November 9, 1976, the Virginia divorce became a final divorce *a vinculo matrimonii.*"

[4] ORS 109.324 provides:

"If either parent is believed to have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption and such parent does not consent in writing to the adoption, there shall be served upon such parent a citation in accordance with ORS 109.330 to show cause why the adoption of the child should not be decreed. Upon hearing being had, if the

*either* wilful desertion *or* wilful neglect without just and sufficient cause to provide proper care and maintenance for a child for the year next preceding the filing of the adoption petition, the court may remove the requirement of obtaining that parent's consent to the adoption. Our review is *de novo.*

### (1) *Desertion*

"Desertion," as used in the statute, necessitates proof that the parent has foregone the exercise of all parental rights in the child. *Moody v. Voorhies,* 257 Or 105, 475 P2d 579 (1970). Further, the desertion for the one-year period must be voluntary. *Moody v. Voorhies, supra.* Thus, in *Moody,* the court found that there had been no wilful desertion when it was shown that the father, recently recovered from a mental illness, had been committed by court order to an institution for the year before the filing for adoption. Here, however, father is healthy and affluent. His complete inaction since 1977, the time he became aware of the children's Corvallis address, can be interpreted only as being "voluntary."

■ ■ Because of the fundamental and vital importance of the rights of a parent, neither a showing of the voluntariness of a parent's conduct nor evidence of a failure to visit and to provide support is enough, standing alone, to establish desertion. *Mahoney v. Linder,* 14 Or App 656, 668, 514 P2d 901 (1973). Mother and stepfather must show that father's conduct was "wilful." In this context, "wilful" refers to conduct that evidences "a settled purpose to forego all parental duties and to relinquish all parental claims to [a] child." *See Omlie et ux v. Hunt,* 211 Or 472, 482, 316 P2d 528 (1957).

court finds that such parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption, the consent of such parent at the discretion of the court is not required and, if the court determines that such consent is not required, the court shall have authority to proceed regardless of the objection of such parent. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions. This section does not apply where consent is given in loco parentis under ORS 109.316 or 109.318."

■ We discern father's intent from his statements, his conduct and the surrounding circumstances. He has never asked to visit his daughter, nor is there any indication in the record that he ever sought to communicate with her. He has never contributed to her support and concedes in his brief that his "efforts toward [her] were minimal, if not nil * * *." He testified: "[W]hy should I be worried about seeing her when I haven't been able to see my son who I raised for four years?" His failure to support and communicate with his daughter was not the result of financial hardship or other disability, or any agreement or understanding between the parties. We find by clear and convincing evidence that father has wilfully deserted his daughter.

### (2) *Neglect*

■ ■ Although failure to support is not conclusive proof of neglect, it is relevant evidence on the issue whether there has been neglect. *Omlie et ux v. Hunt, supra.* Since the dissolution, father's annual income has been approximately $60,000. In order to collect accrued but unpaid child support, mother brought an action under URESA[5] in late 1976. Father testified that he had made no support payments from January, 1977, until May, 1981. As discussed below, in an order entered in February, 1981, a Virginia court required father to resume the payment of child support "immediately." This petition for adoption was filed April 3, 1981. Father contends that the evidence shows that he had "just and sufficient cause" for not supporting his children. He offers the following reasons: (1) he acted on the advice of a lawyer that he cease paying child support, and (2) his failure to provide support resulted from the actions of the mother and stepfather. The acceptance of bad advice, even from legal counsel, does not relieve a father of his support obligations. His second "reason" is likewise without merit. Although it is clear that the custodial parent's interference with the noncustodial parent's efforts to see a child may excuse what otherwise appears to be neglect, *see Berry v. Letchworth,* 19 Or App 261, 527 P2d 145 (1974),[6] a parent cannot justify the failure to pay support or the lack of

---

[5] Uniform Reciprocal Enforcement of Support Act, ORS ch 110.

[6] In *Berry v. Letchworth,* 19 Or App 261, 263, 527 P2d 145 (1974), the court explained that:

visitation by asserting that visitation was made "difficult" by the custodial parent. *See Cramer v. Leistikow,* 37 Or App 539, 588 P2d 53 (1978).

Father claims that he did not know where the children were, yet he admitted that an attorney provided him with mother's Corvallis address in "early 1977." She and step-father have lived at the same address since May, 1977, and at all times have had a listed telephone number. Father did not send any correspondence to that address to either child during the years 1977, 1978, 1979 or 1980. He testified that he never called directory assistance for mother's phone number. Mother testified that she had never attempted to hide the children's whereabouts; father complains that she made no effort to keep him advised of her address.

This controversy came to a head in 1980. In the summer of that year, mother and stepfather went to Virginia for a family vacation. Several weeks after their arrival, father spoke with either mother or stepfather concerning visitation with his son, whom he had not seen for approximately four years. He requested a two-week visit, but mother suggested a one-day visit instead in light of the potential impact on the son, who, according to her, was "very upset." Balking at the restrictive conditions of the proposed visit, father chose not to see his son. He did not think it would be "any satisfaction" to him. In December, 1980, a hearing was held by a Virginia court on father's motion that the court enforce his visitation rights with Ken. Mother moved to dismiss that motion. By order entered February 11, 1981, the court (1) awarded father visitation rights as set forth in the "[Stipulation] Agreement," (2) ordered him to resume payment of child support through the clerk of court "immediately," (3) took under advisement the question of past due but unpaid support and (4) required mother to provide father with her address

---

"* * * the natural mother of the child is a person of relatively substantial means who declined the natural father's admittedly minimal efforts to provide a minimal degree of child support, and who resisted with considerable vigor and with the aid of her present husband *all* attempts by the natural father to visit the child. * * *" (Emphasis supplied.)

That is not the case here.

and phone number. After this adoption proceeding was commenced, father spoke with his son several times by telephone.[7] In addition, there was testimony that he established a joint checking account with his son[8] and in May, 1981, tendered a support check that was marked for the son but was not negotiated by mother. Finally, father argues that at all times his children had adequate food, clothing and shelter.

In *Brooke v. Bosley,* 21 Or App 537, 536 P2d 543 (1975), an adoption proceeding, the father challenged the sufficiency of evidence to support a finding that he had wilfully neglected his son. In late 1970, he ceased making payments for the support of his son and had paid nothing until well after the petition for adoption was filed in June, 1973. He had last visited the child in July, 1970, and thereafter wrote his son several letters and sent three or four gifts. The father also had a daughter from a previous marriage. For the same period of time in 1970 and early 1971 he had not paid court-ordered support for that child, although her mother had financial need. According to the father, he left for Europe in late 1970 in an attempt to recoup stock market losses. He made no contact with his son or the mother until January, 1972, when he sent his son a gift. The mother wrote to the father reminding him of his failure to meet his financial and parental responsibilities to his son. The father visited the United States several times but made no attempt to see or speak with his son for fear that he would be jailed for nonsupport. He said that that was on his attorney's advice. He contended that if he had had reason to believe his son was not being adequately cared for, he would have "taken steps to remedy the situation." The court affirmed the finding of wilful neglect, holding as follows:

> "* * * [T]he whole central question is whether for one year preceding the filing of the petition the nonconsenting parent wilfully and intentionally neglected without

---

[7] Father testified that he attempted to call Ken on December 24 and 25, 1980, but was told that he was not at home.

[8] As of October 21, 1981, the account balance was $382.81. According to father, the account was opened sometime after the December, 1980, Virginia court hearing.

just and sufficient cause to provide proper care and maintenance.

"Sufficient evidence is present to support the finding. The father had money available. He had sharp warnings that he was grossly delinquent in all of his parental duties. He failed under these circumstances to not just one but two of his children. His intention about child neglect can be inferred from evidence of his failure toward his other child, whose mother is not well off financially. It also can be inferred from the other evidence we have reviewed. Finally, his own unbelievable testimony about his financial dealings and condition throws his entire credibility into question." 21 Or App at 545-46.

Here, as in *Brooke,* the evidence does not establish the justification for father's conduct that he claims. The 1976 URESA action and the 1981 Virginia court order that he pay child support constituted sufficient notice to him of his continuing responsibility to provide maintenance for his children and his failure to meet that obligation. He had the financial resources to pay but chose not to do so. He may have faced obstacles and constraints, but, unfortunate as they may have been, they did not constitute just and sufficient cause to neglect his children. Although mother did not encourage visits, we are not persuaded that she unreasonably interfered with his visitation rights. We conclude that his failure to visit his children resulted from his own neglect to assert and to exercise rights granted him under the decree. *See Cramer v. Leistikow, supra.* He knew where his children were, at least from 1977 until this proceeding began. He had the opportunity to visit them in Virginia. He had the means to travel to Oregon and to arrange visitations but did not.

The dissent finds "inescapable" the conclusion that mother and stepfather "embarked upon a systematic course of conduct designed to make it impossible for father to exercise [his visitation] rights" and asserts that "under these circumstances" our decision in this case constitutes "a gross miscarriage of justice." The dissent's analysis fails to account for father's deliberate choice not to provide financial support for either of his children and, in addition, is not supported by the evidence.

First, father admitted making no support payments for the benefit of his children from January, 1977, until May, 1981. The dissent apparently concedes that father's explanation that he withheld these payments "on the advice of an attorney" is without merit.[9]

Second, although mother testified that she *personally* did not supply father with her Corvallis address, it is undisputed that (1) an Oregon attorney provided him with that address in "early 1977"; (2) mother, stepfather and the two children had lived at that address since May, 1977; and (3) during that period, mother and stepfather had a listed telephone number. Whatever mother's intent in not providing father with her address, father's inaction and not mother's conduct was the primary cause for his failure to communicate with his children during this four-year period. His neglect of his children was not the *"result* of constraints imposed by [mother]." *See Cramer v. Leistikow, supra,* 37 Or App at 542-43.

Furthermore, mother's conduct hardly rises to the level of a "systematic" attempt to make father's exercise of his visitation rights "impossible." In March, 1976, mother took Ken to Virginia for a two-week visit with father. The visit had been arranged during earlier conversations between father and mother. Later that same year, father asked for visitation with Ken during the Christmas holidays. Mother responded through her attorney that the proposed visit was outside the provisions of the "Stipulation Agreement" but did not foreclose visitation consistent with the agreement. The record indicates no attempts by father to arrange a visit with his son between the 1976 request and the request he made in the summer of 1980, during mother's second trip to Virginia. Although we agree that mother's insistence, in response to the latter proposal, that father's visit with Ken be limited to a single day

---

[9] In *Garrison and Garrison,* 28 Or App 297, 300-01, 559 P2d 513 (1977), we stated:

"To the extent that the wife is responsible for the reluctance of the child to continue visitation with the husband, the trial court was correct in noting that the appropriate remedy for violation of visitation rights is a contempt proceeding. To condition or reduce child support for the wife's violation of visitation rights in effect punishes the child for contumacious acts of the wife." (Citations omitted.)

was not consistent with the visitation provisions of their agreement, this single refusal simply does not justify or explain father's previous or subsequent lack of contact with his children. Finally, although the Virginia court in February, 1981, reaffirmed father's rights to visit and communicate with Ken and ordered him to resume payment of support "immediately," it was not until *after* the initiation of the adoption petition that father sent mother a child support check and began talking with Ken by telephone.

There is no question that father has failed "to provide proper care and maintenance" for his children for the statutory period. ORS 109.324. Father admitted that much, and the trial court so found. The issue is whether the neglect was "without just and sufficient cause." His failure to provide support for or arrange visitations and communications with his children during the four years before the filing of the petition cannot be justified by his reliance on the advice of attorneys that he not pay support and mother's failure *personally* to provide him with her address and phone number.

We find by clear and convincing evidence that father has neglected without just and sufficient cause to provide proper care and maintenance for both his children during the one-year period preceding the filing of the adoption petition.

Because our review is *de novo,* having made findings of *desertion* as to the daughter and *neglect* as to both children, we could proceed with an independent determination whether father's consent to the adoption is required. We decline to do so. ORS 109.324 provides that, on a finding of wilful desertion or neglect, "the consent of such parent at the *discretion of the court* is not required." Given the basis for the ruling below, it is clear that the trial court has had no opportunity to exercise its discretion. On remand, it will have that opportunity in light of our findings.

Reversed and remanded.

**THORNTON, P. J.,** dissenting.

I dissent for the reason that I believe the majority's position is untenable on two grounds. First, as I see it, the

appeal should be dismissed, because this court lacks jurisdiction to entertain it. This is true for the simple reason that mother's new husband *did not appeal.* ORS 19.029, 109.310(1). Second, even assuming *arguendo* that mother can somehow appeal, notwithstanding that her new husband did not join in the appeal, I am in disagreement with the majority's conclusion on the merits after reading the record and briefs in this case. I agree with the trial judge that the petitioner-mother (and her new husband) failed to meet their burden of proof that father wilfully deserted or neglected his minor children without just cause within the meaning of ORS 109.324.

## JURISDICTION ISSUE

Addressing the jurisdiction issue first, it is undisputed that wife's new husband was not named in the notice of appeal. ORS 109.310(1) requires that an adoption petition by a married person "shall not be granted unless the petitioner's spouse joins therein." ORS 19.029(b) provides that all notices of appeal must contain, *inter alia,* "[t]he names of the parties [to the appeal]." The procedure provided in ORS 109.324 for dispensing with the consent of a parent who has deserted or neglected the child (which is involved here) is an integral part of the adoption statutes (ORS 109.305 to 109.410). All sections of a law must be construed in *para materia. Rosentool v. Bonanza Oil and Mine Corp.,* 221 Or 520, 352 P2d 138 (1960). If both spouses must be joined in the petition, it follows that they must be joined in any appeal.

Apart from the above statutes, it has long been the law in this state that all parties to a judgment or decree whose interests may be substantially affected by the adjudication of the appellate court must be included in the appeal. Without all such parties before it, the appellate court has no jurisdiction. *Hamilton v. Blair,* 23 Or 64, 31 P 197 (1892). The conclusion is inescapable that Robert Street is an indispensable party and that the appeal is fatally defective for failure to include an indispensable party to the appeal. It follows, therefore, that this court has no jurisdiction to entertain it. *Cottrell et ux. v. Prier et ux.,* 187 Or 454, 212 P2d 87 (1949); *Adams et al. v. Kennard et al.,* 122 Or 84, 222 P 1092, 227 P 738, 253 P 1048 (1927). It

is the duty of this court to inquire into its own jurisdiction when the possibility of a lack of jurisdiction is apparent on the face of the record, even though neither party has raised the issue. *City of Hermiston v. ERB,* 280 Or 291, 570 P2d 663 (1977); *Northern Ins. Co. v. Conn Organ,* 40 Or App 785, 791, 596 P2d 605, *rev den* 287 Or 507 (1979); *League of Women Voters v. Lane Co. Bndry Comm.,* 32 Or App 53, 573 P2d 1255, *rev den* 283 Or 503 (1978).

## ON THE MERITS

Leaving the jurisdiction issue aside and going to the merits, I am in equally strong disagreement with the majority on the merits. Boiled down to the essentials, what we have here is not merely a contested adoption proceeding, but a long, bitter fight between divorced parents over the father's attempt to exercise his visitation rights. This adoption appeal is simply the latest chapter in this unhappy saga.

This was a six-year marriage. The union produced two children, a son and a daughter. The marital domicile of the couple was in the State of Virginia.[1] In 1975, mother filed for divorce in Virginia, and the parties entered into a statutorily sanctioned agreement whereby mother was awarded custody of the children, father was allowed certain visitation rights and agreed to pay $400 per month child support. The parties apparently separated on less than friendly terms. Controversy over visitation was not long in developing. Mother moved first to Richmond, Virginia, and then to Oregon, where her parents lived. Father remained in Virginia.

Father continued to pay some child support until January, 1977. In early 1977, after mother had filed a URESA proceeding in Corvallis, father paid mother's Virginia attorney some $1400, which included accrued and unpaid support payments. Father testified that he was promised the current address of mother in Oregon as part

---

[1] In *Grubs v. Ross,* 291 Or 263, 630 P2d 353 (1981), our Supreme Court held that Oregon courts have no jurisdiction to modify a Montana decree of child custody where Montana continues to have modification jurisdiction under the Uniform Child Custody Jurisdiction Act. Query: Should this rule apply to adoption proceedings filed in the second state?

of this transaction, but that this information was never furnished. He sought their address by telephoning her father in Roseburg and by writing mother in care of her parents at Roseburg. He testified that he made numerous other inquiries but without success. Later he turned all matters, including his efforts to contact his son, over to his Virginia attorney. On one occasion he attempted to give the boy a bicycle for Christmas after talking by telephone with the maternal grandfather, but mother refused delivery of it because the son "had no place to ride it." Father also sent his son hats and a jacket and established a savings account for the boy.

When mother failed to advise father of the whereabouts of the children and would not allow him to visit the son, father went to a lawyer in Virginia. The lawyer advised him that he need not continue to pay child support if mother denied him his right to visitation. Father then stopped paying child support. Whatever may be the law in Virginia in this regard, this was incorrect legal advice insofar as the law in this state is concerned. *See Garrison and Garrison,* 28 Or App 297, 300, 559 P2d 513 (1977).

In 1980, when mother was in Virginia with the children and her new husband, presumably visiting her new husband's parents, she did not contact father concerning his visitation rights. When father contacted her he was refused visitation except under restrictive conditions. Father thereupon filed proceedings in Virginia seeking to compel mother to grant him visitation rights. Mother was served with a copy of the motion but evidently chose not to appear at a July 22, 1980, hearing.

On February 11, 1981, the Virginia court ordered mother to allow such rights, to provide father with the address and phone number of her home in Oregon and to allow phone conversations between father and son. The court also ordered father to resume payment of child support. Father did not resume support payments, however, on the advice of his attorney, because mother had not furnished him with her address and phone number as required by the Virginia court order. In May, 1981, father, however, mailed a support check to mother, but it was never cashed.

In April, 1981, mother, together with her new husband, filed the instant petition for adoption of the two minor children.

Mother acknowledges that she intentionally failed to inform father where she lived in Richmond, Virginia, or Albany and Corvallis, Oregon, so that he could not exercise his visitation rights. The conclusion is inescapable that mother (and later her new husband), for whatever reason, were not permitting father to exercise the visitation rights guaranteed him by the Virginia divorce decree and had embarked upon a systematic course of conduct designed to make it impossible for father to exercise those rights and to sever and extinguish all ties between the children and their biological father.

The standards for determining a stepparent adoption petition are the same as those governing parental termination proceedings under ORS 419.523. *State ex rel Juv. Dept. v. Draper,* 7 Or App 497, 503, 491 P2d 215 (1971), *rev den* (1972). To authorize this adoption without father's consent and to deprive father of his parental rights under these circumstances would be a gross miscarriage of justice and contrary to the rationale of a long line of precedents in this state. *See, e.g., Omlie et ux v. Hunt,* 211 Or 472, 316 P2d 528 (1957); *Brown v. Taylor,* 22 Or App 219, 538 P2d 1268, *rev den* (1975); *Mahoney v. Linder,* 14 Or App 656, 514 P2d 901 (1973); *Eacret v. Dews,* 10 Or App 511, 500 P2d 481, *rev den* (1972).

The experienced trial judge, who saw and heard the witnesses, reached a conclusion that is amply supported by the evidence. I submit that there is no rational basis for overturning it. I would affirm. As the trial court said from the bench at the conclusion of the hearing:

" * * * I don't visualize a father has to hire an investigator to go find where the children are. * * * I don't believe under these circumstances I can find that he did this without just and sufficient cause.

" * * * * *

"These children have a right to know their biological family, their extended family, they have the right to preserve the right of inheritance, have a right to maintain the family name.

" * * * * *."

Finally, it is significant that the United States Supreme Court in a recent landmark decision, *Santosky v. Kramer,* ___ US ___, 102 S Ct 1388, 71 L Ed 2d 599 (1982), declared unconstitutional a New York law allowing termination of parental rights on proof by a "fair preponderance of the evidence." The court held that the fundamental liberty interest of natural parents in the care, custody and management of their child is protected by the Fourteenth Amendment and that therefore such proof must be by "clear and convincing evidence." This decision underscores the high importance that the nation's supreme judicial authority attaches to the protection and preservation of parental rights and to the high standard of proof required in order to judicially terminate those rights.

For the foregoing reasons I respectfully dissent.