Argued April 16, affirmed May 20, 1974

IN THE MATTER OF J., A MINOR CHILD.

## STATE EX REL JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, *Respondent, v.* REDMOND, *Appellant.*

522 P2d 503

*Brad Littlefield,* Portland, argued the cause for appellant. With him on the brief were Goldsmith, Siegel & Engel, Portland.

*Charles J. Merten,* Portland, argued the cause for respondent. With him on the brief were Marmaduke, Merten & Saltveit, Portland.

Before SCHWAB, Chief Judge, and FORT and TANZER, Judges.

FORT, J.

This case comes before the court on an appeal by the appellant-mother from an order of the circuit court terminating her parental rights as the mother of an illegitimate child.

The petition, as amended, was based both under ORS 419.523 (2)(a) and (b).[1] It was first filed under ORS 419.523 (2)(a). After the hearing and over appellant's objection, the court directed that it be amended to bring it within ORS 419.523 (2)(b) as well. One of the assignments of error challenges this amend-

---

[1] ORS 419.523 provides:

"(1) The parental rights of the parents of a child within the jurisdiction of the juvenile court as provided in subsection (1) of ORS 419.476 may be terminated as provided in this section and ORS 419.525. The rights of one parent may be terminated without affecting the rights of the other parent.

"(2) The rights of the parent or parents may be terminated as provided in subsection (1) of this section if the court finds that the parent or parents:

"(a) Are unfit by reason of conduct or condition seriously detrimental to the child; or

"(b) Have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions."

This statute was amended by Oregon Laws 1973, ch 808. However, at the time of the hearing in this case, the statute as amended was not yet in effect. We therefore do not consider it.

ment. In the view we take of this case, it is unnecessary to decide this question.

Appellant-mother, following sexual associations with several boys, gave birth to this child on March 10, 1969. She was then 14. She also had several casual sex partners after the birth of the child. She resided with her own mother who, when the child was about four months old, called the authorities to take custody of the child after appellant had stayed out all night. The child was made a ward of the court and placed in foster care, where he has since remained.

Appellant attempted suicide in November 1969 and was treated at Multnomah County Hospital and, upon her release, was placed in Multnomah County Juvenile Home. From there she was placed in Carroll House for Girls, a group foster home. After running away from there, she was committed to Hillcrest, the state training school for girls, in May 1970. Appellant was released on parole from Hillcrest in August 1970 and soon met and lived with another boyfriend, by whom she conceived another child. This child was born in May 1971. There was no marriage, and they separated in August 1971. The father took custody of the child born of that relationship without objection by appellant.

At this time, the juvenile court personnel again discussed with appellant the need for future planning for the child and set up visitation schedules for her. Instead, appellant violated her parole by leaving the state and went first to the state of Washington. She soon joined a carnival there and, after living with two different men successively, one in Washington and then in California, earned as much as $1,000 a week

during the fall of 1971, working in what she referred to as the "snake pit." During this time appellant purchased a 1959 Corvette automobile for $1,300 cash. At no time did she send money to or for the child although she knew his whereabouts. The juvenile authorities did not know where appellant was until they found her in Arizona in the spring of 1972. She was returned to Hillcrest and later placed with Youth Progress for a time.

Appellant was brought before the juvenile court on May 1, 1972, and was advised she had better change her ways if she ever wanted to get the child back. She was furnished a copy of the May 1, 1972 court order. Certain conditions were set up for her to meet. In July 1972, after visiting the child a few times, she agreed with the foster parents it would be better for the child that she both no longer visit him and that the foster parents should adopt him. She then discontinued her visits. However, early in 1973, appellant formally consented to his adoption by her own mother, but this adoption was denied by the court, and the child remained a ward in foster care under supervision of the Children's Services Division.

About this time, appellant met her present husband whom she soon after married in late July 1972. She was at that time pregnant, and another child was born to her February 2, 1973. In August 1973, they were separated for approximately a month. During this time she lived with a close male friend of her husband in his apartment, where they resided alone together for a week. It is not clear from the record where she lived the remainder of the month. Shortly before or about the time of this separation, appellant again became pregnant. There was some controversy

about the paternity of the unborn child. She had an abortion on September 9, 1973, and she and her husband were reconciled shortly before the first hearing in this case, which was held on September 18, 1973.

■ From the foregoing facts, we conclude that the conduct of appellant from the time of the conception of this boy, continuously to the time of the hearing in September 1973, has been such as to establish that the best interests of the child will be served by the termination of appellant's parental rights.

Hope for her child springs eternal in a mother's heart. But, however sincerely articulated, it is not alone sufficient to overcome a clearly defined pattern of conduct consistently demonstrated by the mother throughout her life.

■ In *State v. Blum,* 1 Or App 409, 417, 463 P2d 367 (1967), a case involving the meaning and application of the word "condition" in ORS 419.523 (2)(a), we said:

> "We reject, because the clear language of the statute does not say or imply it, the contention that a parent must, by some conduct 'create' a condition which causes the parent to be unfit before the parent's rights can be terminated."

Here we also reject the suggestion that the "conduct" of the parent must have been done by the parent with an intent to or even awareness that such conduct demonstrates the parent to be unfit to discharge the responsibility toward a child minimally required by the law. The test of the termination statute is whether the conduct shown by the evidence has established that its effect has been seriously detrimental to the child.

In *State v. Blum,* supra, 1 Or App at 415, we said:

"In 39 Or L Rev 305, 312 (1960), the Honorable Ralph M. Holman, who was chairman of the interim subcommittee which prepared and submitted the juvenile code to the Oregon legislature, including the part of the act in question here, explained:

" '* * * [T]he emotional welfare of the child requires that he be integrated as a member of a family * * *.

" 'It was the feeling of the committee that a child would never have an opportunity to be completely integrated in another family as long as any legal relationship, privileges, or responsibilities whatsoever remained with respect to his real parents. Thus, the child's emotional well-being and his resultant relationship to society in truth require not only a permanent severance of custodial rights but of all rights.'

"Dr. Morrison, after testifying to this diagnosis of defendant, said that it would be damaging to the child to be with defendant. He enlarged on that answer by stating:

" 'It's damaging in this way: In that the emotional well-being and growth and confidence that a child needs must come from his immediate environment and particularly people in which his custody is charged, that is his own parents or the parents with whom he is living. This is something that is acquired very directly by living with people, not just what they say but the reactions that the adults have. They absorb the strength or the weaknesses, the health or sickness of the person with whom they live.' "

In *State v. McMaster,* 259 Or 291, 303, 486 P2d 567 (1971), our Supreme Court, after first holding that former ORS 419.523 (2)(a) was constitutional, considered the statutory phrase "seriously detrimental

to the child." In reversing the order entered in that case, it said:

> "We are of the opinion that the state of the McMaster family is duplicated in hundred of thousands of American families,—transiency and incapacity, poverty and instability. * * * When the legislature used the phrase, 'seriously detrimental to the child,' we believe that they had in mind a more serious and uncommon detriment than that caused by the conduct of parents such as the McMasters. * * *"

We conclude that the facts in this case, although containing elements of transiency and incapacity, poverty and instability, demonstrate much more. Appellant, twice within 13 months preceding the filing of the petition, expressed the wish to have her son adopted—first by the foster parents with whom the child had been living for a long period, and later by her own mother in a court proceeding.

In *State v. McMaster*, supra, the parents of the child remained married to and at least spasmodically living with one another in a common home throughout separations. Thus, there was a continuing, though unstable, family relationship between the parents. The court said:

> "* * * The best interests of the child are paramount; however, the courts cannot sever the McMasters' parental rights when many thousands of children are being raised under basically the same circumstances as this child. The legislature had in mind conduct substantially departing from the norm and unfortunately for our children the McMaster's conduct is not such a departure." 259 Or at 303-04.

There is no evidence in this record to support the conclusion that the conduct of appellant has been

other than that "substantially departing from the norm." It is clear that it has been substantially detrimental to the child.

We agree with the trial court the state has established that "it is in the best interests" of the child that the parental rights of the mother should be terminated.

The remaining assignments of error are without merit.

Affirmed.