Argued and submitted April 4, the decision of the Court of Appeals reversed; the
circuit court's decree of adoption vacated November 22, 1991

In the Matter of the Adoption of
Benjamin Eder and Dylan Eder, Children.

Robert L. EDER
and Michele Longo Eder,
*Respondents on Review,*

*v.*

Anita WEST,
*Petitioner on Review.*

(CC A414; CA A50557; SC S37667)

821 P2d 400

James F. Young, Oregon Legal Services Corporation, Coos Bay, argued the cause and filed the petition for petitioner on review.

Stephen A. Lovejoy, Lincoln City, argued the cause for respondents on review. With him on the response to the petition was Jenny Cooke, Portland.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

■    This is a contested step-parent adoption proceeding pursuant to ORS chapter 109. Robert Eder (father) and Michele Longo Eder (wife) (hereinafter referred to collectively as petitioners) petitioned to allow wife to adopt father's two children from his previous marriage to Anita West (mother). The trial court found that mother's consent to the adoption was not necessary because of her wilful and unexcused neglect of her children. ORS 109.324.[1] The court granted the petition and entered a decree of adoption. The Court of Appeals, sitting *in banc*, affirmed 6-4. *Eder v. West*, 104 Or App 84, 799 P2d 192 (1990).

We allowed review to consider whether the record contains clear and convincing evidence that mother's consent to the adoption was not required.[2] On *de novo* review, ORS 19.125(4), we do not find such evidence. Therefore, we reverse the Court of Appeals' decision and vacate the trial court's decree of adoption.

Father and mother were married in 1978. Two children were born of the marriage, B (in 1980) and D (in 1982).

---

[1] ORS 109.324 provides in part:

"If either parent is believed to have wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption and such parent does not consent in writing to the adoption, there shall be served upon such parent a citation in accordance with ORS 109.330 to show cause why the adoption of the child should not be decreed. Upon hearing being had, if the court finds that such parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child for one year next preceding the filing of the petition for adoption, the consent of such parent at the discretion of the court is not required and, if the court determines that such consent is not required, the court shall have authority to proceed regardless of the objection of such parent. In determining whether the parent has wilfully deserted or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may disregard incidental visitations, communications and contributions."

The legislative history of ORS 109.324 indicates that it was intended that courts apply the statutory criteria with discretion, rather than mechanically. *Swarthout v. Reeves*, 26 Or App 763, 767, 554 P2d 617 (1976).

[2] *See Zockert v. Fanning*, 310 Or 514, 528, 800 P2d 773 (1990) (clear and convincing standard is required in contested adoption proceedings under ORS 109.324); *Santosky v. Kramer*, 455 US 745, 747-48, 102 S Ct 1388, 71 L Ed 2d 599 (1982) (due process requires that before a state may sever completely and irrevocably the rights of parents in their natural child, the state must support its allegations by at least clear and convincing evidence).

In 1982, father filed a petition for dissolution of the marriage. In 1983, a dissolution judgment was entered which awarded father custody of the children. The dissolution court found that father would provide a far more stable emotional environment for the children and that he was "conscientious, hard-working and motivated to provide a stable home." The court further found that mother was emotionally unstable and likely to make unannounced and sudden changes in her life that would not be conducive to a stable environment for the children. The court awarded mother "liberal" visitation on a specific schedule.

In July 1984, father moved to terminate mother's visitation based on allegations that, during the months preceding the filing of his motion, he had noticed " 'regressive' [behavior] patterns in [B] after visitation with mother, such as wetting his pants and 'acting out' earlier stages of development"; that he had observed B at mother's home "dressed in a young girl's dress"; that B had reported to him that B had been sleeping in the nude with his mother and that she had 'played with him' "; and that B had reported to a Children's Services Division caseworker "that his mother had been 'playing with his genitals'," and that she had engaged in other forms of sexual contact when they were together. A temporary order terminating mother's visitation with both children was entered.

After a hearing in September 1984, the trial court found that mother was not credible, that she was paranoid and emotionally unstable, and that there had been "sexually oriented acts [by her] towards [B]" contributing toward his emotional problems, including gender identity questions. Based on those findings, the court prohibited any further visitation by mother with the children except for telephone visits personally supervised by father. The court further ordered that visitation would not be resumed without the court's approval and after mother had been evaluated by a court-approved psychiatrist and had received "such therapy or further evaluation as may be recommended [by that psychiatrist]."

In December 1984, mother pleaded "no contest" to and was convicted of the crime of sexual abuse in the second degree, ORS 163.415, a Class A misdemeanor, for the acts

that she committed against B earlier that year.[3] She was sentenced to one year in custody; execution of that sentence was suspended, and she was placed on five years' probation. Two special conditions of her probation were that she "[h]ave no contact with [B] until further order of the Court," and that she "[c]ontinue her psychiatric evaluation and treatment." Subsequently, mother has consistently denied any sexual misconduct with B, stating that she only pleaded "no contest" in 1984 so that B would not have to testify in court.

In January 1985, mother met twice with Dr. Kjaer, a psychiatrist whom she chose and the dissolution court approved, for evaluation.[4] Kjaer diagnosed mother as:

"Borderline Personality, Acute Situation Reaction, Normal Grief Response (to the divorce and withdrawal of children), Possible Manic Depressive (Bipolar) Disease, and Pedophilia (by history)."

He reported that mother's denial was a significant problem impeding her treatment, that she must "accept the reality of her misbehavior," and he recommended long-term counseling and psychotherapy coupled with medication. He added:

"It is possible, however, to entertain a treatment program in which the patient is allowed to temporarily maintain a partial denial in order to develop a trust and working relationship with the therapist. It is possible to facilitate that

---

[3] The indictment charged that mother "did unlawfully and knowingly subject [B], a person under the age of 12 years, to sexual contact, by touching the penis, a sexual part of [B] * * *."

ORS 135.335 provides in part:

"(1) The kinds of plea to an indictment, information or complaint, or each count thereof, are:

"* * * * *

"(c) No contest.

"(2) A defendant may plead no contest only with the consent of the court. Such a plea shall be accepted by the court only after due consideration of the views of the parties and the interest of the public in the effective administration of justice."

ORS 135.345 provides:

"A judgment following entry of a no contest plea is a conviction of the offense to which the plea is entered."

[4] Apparently mother already had been seen by Dr. Pacheco, a clinical psychologist, who had been retained by mother's attorney to work with her. Dr. Kjaer accepted the findings of Pacheco's tests "as well as the formal objective testing done elsewhere" and, therefore, Kjaer did not repeat any testing.

with antidepressive medication which will strengthen the patient's internal resources. The patient, however, must be prepared to accept the financial responsibilities inherent in this phase of therapy and probably would be required to pay for each session in advance."

Kjaer reported that he was unable to recommend a treatment program for mother "which is cost effective," because of her refusal to admit "that she has done something wrong." Kjaer concluded:

"At this point I see no advantage in attempting to engineer a visit between [mother] and her children, since she does not have their best interest solely at heart because she cannot focus clearly on their needs rather than hers. If she cannot accept the reality of *her* misbehavior and the therapy outlined above, she might have to relinquish her parental rights permanently." (Emphasis in original.)

Because she understood that Kjaer would require her to admit that she had sexually abused her child as a prerequisite to treatment, and because she also asserted that she could not afford to pay for Kjaer's services, mother rejected Kjaer's diagnosis and treatment plan.

Later in January 1985, mother moved to New Mexico, where she saw Dr. Collins, a psychiatrist, about four times in March and April 1985. A free-lance artist, mother paid Collins with artwork that she created. In an April 1985 letter to mother's lawyer, Collins recommended that mother be allowed supervised visitation with the children. Collins wrote that, although mother had denied any sexual abuse of B, Collins would not "pass judgment" on whether mother had done so and that he would not be treating her for sexual abuse. He gave no diagnosis of mother's condition. Mother saw Dr. Collins between 15 and 20 times during 1985 to 1988. According to Collins, the majority of those sessions revolved around mother's concerns about the children and her hopes of having a relationship with them.

In May 1985, based on the fact that mother had moved to New Mexico and was seeing Collins, her lawyer asked the dissolution court for permission to substitute Collins as her treating psychiatrist. The court did not approve Collins as a treating psychiatrist. Thereafter, mother changed her lawyer and, in June 1985, her new lawyer moved

to dismiss her motion for change of psychiatrists for the reason that mother had returned to Oregon. That motion was allowed.[5] Mother never sought treatment with Dr. Kjaer thereafter. In July 1985, mother moved *pro se* to reinstate visitation on the basis of her treatment with Collins and his recommendation for supervised visitation. In September 1985, because she had not undertaken therapy with Kjaer, the court dismissed her motion.

In September 1985, mother moved *pro se* that someone other than father read her letters to the children. That motion was allowed. In October 1985, she moved *pro se* to substitute Dr. Collins for Dr. Kjaer, because, she asserted, she had a poor relationship with Kjaer and she could not afford to pay him. That motion was denied.

In October 1985, mother moved *pro se* for the court to suggest "a program of behavior to provide a way to reunite [her] with [the children]." In her affidavit, she complained that she was "frustrated in [her] catch-22 situation," because Dr. Kjaer was the only court-approved psychiatrist but "he doesn't want to be involved and he would write a release letter if I paid a large bill that I cannot." The motion was denied.

In December 1985, mother moved *pro se* to be allowed telephone visits with the children. Because of the special condition of her 1984 criminal probation that she have no contact with B, she was not allowed telephone visits with him. Pursuant to the September 1984 modification order that allowed telephone visits with both children personally monitored by father, however, her motion was allowed as to D.

In April 1986, mother again moved *pro se* to substitute Dr. Collins for Dr. Kjaer. In her affidavit, she stated that she had returned to New Mexico and again was being treated by Collins. In May 1986, she also moved *pro se* to allow the children to visit her in New Mexico. In June 1986, she moved

[5] At the hearing, the court told mother:

"I can't order you to see a psychiatrist. I am not ordering you to see a psychiatrist. You can or cannot see as many psychiatrists as you wish and are willing to pay for. I am saying that the order stands that if you wish to see your children you will take evaluation and treatment by Dr. Kjaer, period. And that doesn't mean that you shop around and find some other psychiatrist and come in again with a motion and then when it's opposed show up and take a dismissal."

*pro se* to have a lawyer appointed for the children. All three motions were denied.

In August 1986, father moved in the dissolution court to terminate mother's parental rights. He alleged that "she has failed or neglected without reasonable and lawful cause to provide for the basic psychological needs of the children for one year prior to" his motion, or that she "is unfit by reason of conduct or condition seriously detrimental to the children and integration of the children into her home for visitation or otherwise is improbable in the foreseeable future due to mother's conduct or conditions not likely to change." He further alleged that it was in the children's best interests and welfare that mother's parental rights be terminated. Father's motion did not cite any specific statutory authority for the termination of mother's parental rights. Mother filed a *pro se* response, denying father's allegations. She also moved: to allow visitation; to order the production of documents, including the children's medical records; to order an independent psychiatric or psychological examination of the children; to order the appointment of a public defender for her;[6] to order the appointment of a lawyer as guardian *ad litem* for the children; and to allow a substitution of psychiatrists. All six motions were denied.

In September 1986, mother again moved *pro se* to change psychiatrists. In her affidavit, she stated, in essence, that she had not sexually abused B and that she only had pleaded "no contest" to that charge to spare B the ordeal of a trial. She also stated that she did not trust Dr. Kjaer, because he had been "unethical" in speaking with father about her therapy before seeing her and because Kjaer had decided the matter before evaluating her. The motion was denied.

In January 1987, acting through a legal aid lawyer, mother moved to dismiss father's motion to terminate her parental rights on grounds of lack of subject matter jurisdiction and failure to state ultimate facts sufficient to constitute a claim. *See* ORCP 21A(1) and (8) (permitting dismissal on

---

[6] At the time these motions were filed, this court had not yet ruled that an indigent parent facing termination proceedings under ORS chapter 109 had a right to court-appointed counsel. *See Zockert v. Fanning, supra,* 310 Or at 524 (the privilege of having court-appointed counsel for indigent persons applies to termination of parental rights by adoption under ORS chapter 109).

such grounds). In April 1987, mother moved *pro se* to withdraw her "request for two year custody." The motion was allowed. She also asked that the court permit the children to travel to New Mexico to attend their maternal great-grandmother's 85th birthday. The motion was denied.

In the fall of 1987, mother returned to Oregon. About that time, she wrote to father suggesting that they negotiate visitation without court involvement. Later, the adoption court found that mother's letter was "of a threatening nature stating that if [father] would not do so, she would take her own actions to visit the children."

In November 1987, mother's lawyer moved for a change of venue from Curry County to Lincoln County, on the grounds that the children lived in Lincoln County and mother planned to move there soon. Her lawyer also moved for the appointment of a "professional counselor" to examine the parties and the children. Both motions were denied. Mother then moved to show cause why father should not be held in contempt for denying her telephone visits with D.

In December 1987, the children's maternal grandmother, who lived in Colorado, visited them at their home in Oregon and later reported to mother about their well-being. Mother asked the grandmother to visit the children as often as possible and to let her know how they were doing.

Later that month, mother moved to appoint a "professional counselor" in lieu of Dr. Kjaer to examine the children and their parents and to report to the court about the "appropriate treatment necessary for [mother] in order to permit contact between her and her minor [children]." The motion was denied.

In January 1988, father asked the court to prohibit mother from having telephone visits with the children until further order of the court. He asserted that he interpreted the court's most recent relevant orders to prohibit any contact by mother with the children and his belief that it was unhealthy for both children for mother to have telephone visits with D only. Later that month, mother spoke to father at a deposition and inquired about the children's well-being.

On January 19, 1988, the trial court received a letter from Dr. Kjaer stating that he would not see mother in the future because of the "past experience" that his office had had with her. Kjaer asked that the court seek "another source" for her psychiatric evaluation and treatment. On the basis of that letter, mother again moved to discharge Kjaer.

In March 1988, a hearing was held on father's motion to prohibit telephone visits and on mother's motions asking that father be held in contempt for denying her telephone visits with D and to change psychiatrists. At the hearing, father and mother stipulated to suspend all telephone visits by mother, to submit the names of several new mental health professionals for the trial court's consideration, and that the court would re-evaluate the situation about six months after mother had commenced therapy with a new mental health professional. Notwithstanding her stipulation, at that time mother told the court:

> "[T]he reality is I'm innocent. * * * [I] can never say that I did [sexually abuse B], because I didn't. [I] have to deal with [a] psychiatrist with my truth. * * * [T]hat's my reality. I am not a sexual abuser."

After the hearing, the trial court modified the dissolution judgment to prohibit any visitation by mother with the children, in person or by telephone, until further order of the court, but to allow mother to send cards and letters to the children that father could "censor" before reading them to the children. The court dismissed mother's motion that father be held in contempt for denying her telephone visits with D, and approved the appointment of a new mental health professional, yet to be named. The court specifically directed that Dr. Collins would not be considered. Thereafter, the court approved Steven Jensen, M.A., Director of the Center for Behavioral Intervention (Center), as mother's new therapist and directed that all orders pertaining to Dr. Kjaer would now apply to Jensen.

In May 1988, petitioners married.

In June 1988, mother was evaluated by Jensen and the Center's staff. Their diagnosis was:

> "Bipolar disorder, manic, moderate; Pedophilia, opposite sex, non-exclusive; Narcissistic Personality Disorder."

The Center's July 1988 report stated in part that "[mother] remains in total denial" and that very likely she was still sexually attracted to B. It also stated that "[mother] is not the kind of person who should play a major role in the development of her children, or any other [children] for that matter."[7] The report continued:

"Insofar as this evaluator [Jensen] could discern, [mother] sees no reason for treatment, would undoubtedly sabotage efforts to address her deficiencies, and would likely change therapists if the topic of sexual misconduct were broached. In addition, her attorney has informed Center for Behavioral Intervention staff that she does not have transportation nor funds for treatment. Our role in this case was to evaluate and provide treatment to [mother] for sexual deviancy.

Notwithstanding their pessimistic evaluation, Jensen and the Center's staff suggested that mother probably should be permitted supervised visitation with her children at that time:

"[S]he is the natural mother of [B] and [D]. To prohibit face-to-face contact while allowing letters, and ultimately, phone calls seems inconsistent at best and cruel at worst. To cut her off entirely would raise the issue of abandonment in her [children], if not now, then in the future. Who is to say that the adverse effects of perceived abandonment are less severe than those of supervised visitation. Unless the [children] expressed no interest in seeing their mother, or their behavior deteriorated significantly following visits, then they should probably be permitted to resume contact. *This should not depend on [mother's] therapy*." (Emphasis added.)

The Center's report concluded:

"During the course of our evaluation, we determined that [mother] was not treatable at this center due to her total denial, lack of motivation and uncooperativeness. If the court wishes to modify its decision that [mother] seek sex offender specific treatment prior to contact with her children the [Center makes the following] visitation recommendations."[8]

---

[7] Apparently mother has been employed at various times as a preschool teacher and day care provider.

[8] The Center's visitation recommendations were:

"1. That relatively infrequent (*e.g.* one per month) supervised visits be permitted involving [mother] and her [children]. Visits should not exceed three hours. Both parents must approve the supervisor and CSD guidelines for such

The trial court accepted the Center's diagnosis and conclusions, and found that mother was "treatable * * * but not amenable to treatment." In August 1988, mother moved to allow supervised visitation on the basis of the recommendations contained in the Center's report.

Later that month, petitioners commenced this stepparent adoption proceeding. In their petition, petitioners alleged that mother's consent to the adoption was unnecessary because she wilfully had deserted or neglected, without just and sufficient cause, to provide proper care and maintenance for the children for one year before the filing of the petition. Mother timely notified the adoption court that she did not consent to the adoption. In September 1988, mother asked the court to make the children available for consultation by a mental health professional and to take the testimony of the children in chambers to determine their "knowledge of and interest in their mother and their desire to see her."

In October 1988, a consolidated hearing was held on the petition to adopt, on mother's motion to permit supervised visitation, and on her probation officer's motion to allow her visitation identical to any visitation allowed in the dissolution case.[9] At the hearing, Dr. Sack, a child psychiatrist who had worked with the children for over four years, testified that the children were "doing quite well." All testimony at

visits should be adopted. A written report by the supervisor should be submitted to the court or its designate at least every fourth visit. The report should address both the positive and negative aspects of the visit. Because the need for supervision is due exclusively to [mother's] sexual transgressions, she should bear 100% of the costs. Should the supervisor observe any sexually inappropriate, neglectful or physically abusive acts, then these should be reported to both CSD and the court or its designate. To minimize the amount of direct interaction between [father] and [mother], the schedule of visits should be set well in advance with the supervisor serving as mediator of minor disputes.

"2. That the [children] be counseled in advance with respect to inappropriate touching.

"3. That [mother] apologize to [B] for the sexual abuse, to the extent she is willing and able.

"4. That [mother] refrain from providing day care to or teaching young children."

[9] The record indicates that mother's probation officer made this recommendation at mother's request and based on his belief that Jensen and the Center had affirmatively recommended that visitation be resumed. The trial court denied the motion.

the hearing concerning the children was consistent with that assessment. Sack recommended that mother's parental rights be terminated.

Dr. Weinrott, a clinical psychologist who participated in the Center's evaluation of mother, testified that the Center did not recommend therapy at the Center for mother because "she wouldn't cooperate with it. She's in total denial with respect to sexual misconduct."

Mother testified that she sent the children small gifts of money from time to time, and that she also had sent them gifts on their birthdays and on holidays and, occasionally, enclosed $5 to $10. She kept track of the children's well-being by speaking to third parties who had contact with or knowledge of them, and she wrote to them about once a week.[10] Father testified that mother's letters to the children sometimes contained inappropriate statements that he would delete before reading her letters to them. Examples included: statements that were critical of father; statements that mother would see the children soon; and a description of a bedroom in mother's new home with a "cozy bed" that B would like when he visited her.[11]

After the hearing, the trial court concluded that the evidence did not support a finding that mother wilfully deserted the children,[12] that her failure to pay support could

---

[10] The trial court found that mother had sent the children less than $100 between 1984 and October 1988, but that she had financial resources that would have allowed her to send greater payments or gifts. The court found that mother had written to the children throughout the time after visitation was terminated, "however the pattern has been inconsistent, sometimes being at least weekly letters and other times much more sporadic." Mother did not challenge those findings.

[11] The trial court found that mother had exercised her right to communicate with the children by letter, but that her letters "were on many occasions not appropriate in that they always talked about how much she missed the children, about wanting to see them or having dreams of visiting them or references to the comfortable cozy bed she had for [B]."

[12] The court stated:

"Abandonment or desertion requires evidence of voluntary conduct that evinces a settled purpose to forego all parental duties and to relinquish all parental claims to the child. *Mead v. Roberts*, 74 Or App 238, 242, [702 P2d 1134] (1985). Visitation is not a parental duty. [Mother] has pursued that one objective over the last several years, to the almost total exclusion of anything else. [Mother] has by her conduct voluntarily foregone accepting any parental duties. [Mother's] conduct over the last several years does however show that she has not foregone her claims to the children, no matter how selfish her reasons for

not be used to find wilful neglect, because she was not ordered to pay support, and that her lack of physical contact with the children did not support a finding of wilful neglect, because she was under court orders not to contact them.[13] The court then stated, "[c]onsidered in the more common situation presented in adoption matters, neglect could not be found."

Nevertheless, the court reasoned:

"This situation is unique. The definition [of neglect] in Webster's dictionary cited by [father's] counsel is helpful in pointing out why this case is different. Neglect is defined as omitting or forebearing to do a thing that can be done or should be done. That is exactly what [mother] has done. She has neglect[ed] [B] and [D] by not doing that one thing she should have done and that is to get treatment for her wrongful conduct to [B]. The requirements placed on [mother] could not have been clearer.[14] [Mother] has expressed throughout these proceedings that she would do whatever is necessary to be able to visit with her children. She has never done it. What she appears to mean is she will do whatever is necessary as long as it does not require her to alter her perception of herself as totally innocent and as a martyr to her cause.

"It is well established by the evidence that [mother] has wilfully neglected her [children] and that there is no just or sufficient cause excusing or explaining that neglect. The children have expressed a desire to visit their mother and [father] has not tried to cut her out of their lives. Yet, [mother] has, by failing to do that one thing that she should do, admit her inappropriate actions and seek treatment, cut

---

pursuing those claims has been. It has not been established that [mother] abandoned or deserted her children."

[13] The court stated:

"Two significant indicators of neglect in the more normal adoption proceeding are financial or other support and contact. [Mother] was ordered to pay no support. She has sent minimal monetary gifts to the children. Her not paying support cannot be used to find neglect, nor can her lack of contact in and of itself be found to be a basis to find wilful neglect. [Mother] was court ordered to have no physical contact but has maintained contact by letter throughout the time since visitation was terminated."

[14] The court found that from September 1984 until October 1988, "the sole reason that [mother] has even seen a mental health professional other than the evaluation by Dr. Kjaer, has been her own personal needs of dealing with her separation from her children. [Mother] has never sought a treatment for improper sexually oriented activities to which she subjected [B]."

herself out of the lives of her children by her inaction. She has neglected those children by her intentional conduct in not seeking the treatment she needs."

The court ruled:

"Based on the findings made and the conclusions reached based on those findings, it is the ruling of the court that [mother's] consent to the adoption is not necessary due to her wilful and unexcused neglect of her children."[15]

The Court of Appeals, sitting *in banc*, affirmed 6-4. *Eder v. West, supra.* Echoing the trial court's analysis, the Court of Appeals' majority concluded that there was clear and convincing evidence of mother's wilful neglect during the pertinent one-year period:

"[S]he refused to do the things that could have led the [trial] court to remove that restriction [on her contact with the children] — to acknowledge responsibility for her sexual abuse of [B] and to obtain sex offender treatment. Mother * * * had not obtained the therapy that the [trial] court required for her emotional and psychological problems, because she refused to accept responsibility for the sexual abuse of her child. Her lack of visitation * * * resulted from her misconduct and subsequent failure to take actions that would have opened the door to resuming visitation." *Eder v. West, supra,* 104 Or App at 90.

The court's dissenters concluded that the majority's holding "legislates new meaning into ORS 109.324":

---

[15] The court also ruled:

"It is not in the best interests of the children to allow visitation. If visitation is going to be significant for the children, it has to be visitation that would be meaningful. The scheme proposed in the Center For Behavioral Intervention report is designed to and would protect the children, but it would be more of a business appointment than a time to allow any emotional involvement with the children. Further, [mother's] conduct in the past would indicate the high likelihood of her trying to blame others for the problems she has caused and trying to indicate that to the children.

"[Mother] continues to deny she did anything wrong. She projects the blame for her problems onto everyone else. There is no reason to presume she would not continue that pattern if she were to see the children. That is not in their best interests. The motion for modification of the restriction on visitation is denied."

In a separate contemporaneous order, the court enjoined mother from having any contact whatsoever with the children until each child reaches the age of 18, unless petitioners agree otherwise.

"The majority makes much of the fact that mother did not acknowledge her sexual abuse of [B] and obtain sex offender treatment. Mother attempted to obtain treatment that did not require her to admit that she had abused [B]. The court declined to approve that treatment program. [We] agree that mother's admitting that she had abused [B] was an important consideration in structuring visitation rights that were in [B's] best interests, but her failure to do so is not 'neglect' within the meaning of ORS 109.324. To the contrary, her attempts to have visitation with her children by vigorously pursuing her legal remedies during the pertinent one-year period meet the statutory test of minimal expressions of concern." 104 Or App at 93.

On review, mother contends that the Court of Appeals erred in concluding that the record contains clear and convincing evidence that she wilfully neglected her children during the pertinent one-year period. She first argues that she has satisfied the "minimal expressions of concern" standard recognized in numerous Court of Appeals cases[16] and that, under all the circumstances, including her lack of financial resources, which precluded financial contribution by her to the children, and the dissolution and criminal courts' orders forbidding her to contact the children, she has done everything she could to demonstrate her interest in the children and her desire to continue a parent-child relationship with them. She further argues that the Court of Appeals impermissibly held her to a higher standard of conduct, *i.e.*, that she could have done "more" than that court's decisions construing ORS 109.324 heretofore have found sufficient to defeat termination of parental rights.

Petitioners contend that mother persists in ignoring that she sexually abused her then three-and-one-half year old son during visitation, that most of mother's court motions were only her attempts to circumvent treatment with Dr. Kjaer, that mother could have and should have contributed something toward the support of the children, and that,

---

[16] *See, e.g., Chaffin v. Palumbo,* 99 Or App 312, 315, 781 P2d 1247 (1989) (whether a parent's behavior constitutes neglect under ORS 109.324 is evaluated by the presence of minimal expressions of concern, which ordinarily are measured in terms of money payments and personal contacts); *Dunne v. McCashum,* 13 Or App 66, 70-71, 508 P2d 821 (1973) (minimal expressions of concern which, if present, indicate that the parent has not neglected the child within the meaning of ORS 109.324).

because of her "denial," mother will never be able to have visitation or other meaningful contact with the children. They also contend that the children's best interests mandate that the adoption be affirmed.

■ ■ The common law did not recognize adoption. In Oregon, the process of adoption is purely statutory.[17] *Zockert v. Fanning*, 310 Or 514, 517, 800 P2d 773 (1990). Generally, in contested adoption proceedings, the adoption court is required to determine that the natural parent of the child who is the subject of the adoption consents to the adoption or that the parent's consent is not necessary by virtue of a statutory exception to the general requirement for consent. ORS 109.312(1); *Zockert v. Fanning, supra*, 310 Or at 518; *Moody v. Voorhies*, 257 Or 105, 108, 475 P2d 579 (1970); *Hughes v. Aetna Casualty Co.*, 234 Or 426, 435, 383 P2d 55 (1963).

■ In a contested adoption, the requirement that the court find by clear and convincing evidence an express statutory exception to the consent requirement is a matter of extreme importance because, when the adoption is complete, "every right and interest of the natural parent" in the child is terminated. *Zockert v. Fanning, supra*, 310 Or at 518; *Moody v. Voorhies, supra*, 257 Or at 109; *Simons v. Smith*, 229 Or 277, 281, 366 P2d 875 (1961); *see State v. Jamison*, 251 Or 114, 117, 444 P2d 15, 444 P2d 1005 (1968) (permanent termination of parental rights is one of the most drastic actions the state can take against its inhabitants). And, "[a]s a general proposition, the law protects the natural rights of parents." *Simons v. Smith, supra*, 229 Or at 278 (citing *Pierce v. Society of Sisters*, 268 US 510, 534-35, 45 S Ct 571, 69 L Ed 1070 (1924) (*dictum*)). Indeed, generally a court lacks jurisdiction to proceed with an adoption absent consent or a statutory substitute for it. *Omlie v. Hunt*, 211 Or 472, 486-87, 316 P2d 528 (1957); *Volz v. Abelsen*, 190 Or 319, 323, 224 P2d 213, 225 P2d 768 (1950). In a step-parent adoption controlled by ORS 109.314, such as this case, a court has subject-matter jurisdiction notwithstanding the lack of consent by an objecting parent but, as a matter of due process, consent or a statutory substitute for consent must be found before the

---

[17] For a general overview of Oregon adoption law, see 1 Family Law, chapter 18 (Oregon CLE 1990).

court may grant a petition to adopt. *Zockert v. Fanning, supra,* 310 Or at 518; *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 189, 796 P2d 1193 (1990); *Simons v. Smith, supra,* 229 Or at 288.

■ The nature of an adoption proceeding, as affecting the rights and interests of the natural parent as well as those of the child, divides it into two stages. The first stage determines whether the natural parent's rights may be terminated. The second stage is an independent determination as to whether it is in the best interests of the child to approve the adoption. *Zockert v. Fanning, supra,* 310 Or at 518-19; *State ex rel Juv. Dept. v. Geist, supra,* 310 Or at 189; *Moody v. Voorhies, supra,* 257 Or at 109-10; *Simons v. Smith, supra,* 229 Or at 280-85.

In the first stage of a contested adoption proceeding, a court may focus only on the rights and interests of the natural parent; the best interests of the child are not in issue. *Zockert v. Fanning, supra,* 310 Or at 518; *Santosky v. Kramer,* 455 US 745, 760, 102 S Ct 1388, 71 L Ed 2d 599 (1982). In *Simons v. Smith, supra,* 229 Or at 280, this court stated that "[t]he reason for terminating parental rights ought to be related to the parent's conduct as a parent." This court then explained the difference between considering the best interests of the child in "divorce jurisprudence" and considering them in a proceeding to dispense with consent for adoption:

> "In an adoption, a court is asked to terminate every right and interest of the natural parent. Adoption goes far beyond the child-centered question of custody during minority. Indeed, the denial of an adoption petition has no necessary bearing on the physical custody of the child. The child's environment can be protected in a number of ways, under the divorce laws and the juvenile code. The petition to adopt concerns a different kind of right, the subjective tie between parent and child, the right of a parent to be identified with his child for emotional, religious or other reasons. A father may hope his son will bear his name; a mother may anticipate that her daughter will inherit her property. On the other hand, there is ordinarily no vital interest of the child which requires the termination of his parents' rights. The use of a convenient name, for example, need not require the formality of adoption." 229 Or at 281.

This court held that "the reasons for terminating parental rights must be related to an objective standard required of all parents rather than to the child-oriented evaluation of competing home environments employed in divorce suits." *Id.* at 285.

■　In a step-parent adoption, the consent of the noncustodial parent may be dispensed with if any statutory ground is available for termination of that person's parental rights. *Simons v. Smith, supra,* 229 Or at 287. Due process, however, requires that conduct grave enough to justify the forfeiture of parenthood must consist of something more than mere failure to obtain custody in a divorce suit. *Id.* In *Simons,* this court held that a noncustodial parent who objected to a step-parent adoption retained parental rights "unless it appears that he has lost his rights because of circumstances covered elsewhere in the code." *Id.* at 288.

> "Once a parent appears and objects, his objection is binding, unless by giving attention to the requirements of at least one other statute which sets forth a recognizable and defensible ground for cutting off the natural rights of parents the trial court can properly conclude that the objector has no further rights. This interpretation of [ORS 109.314] requires the parties to plead and prove their case by reasonably objective standards whenever an adoption is actively resisted." *Id.* at 285.

*Simons* cited ORS 109.316, 109.322, 109.324, and 419.523 as statutes whose standards might apply in a particular case. 229 Or at 279 n 1. This court reaffirmed the holding of *Simons* in *Moody v. Voorhies, supra,* 257 Or at 109, and cited *Simons* with approval in *Zockert v. Fanning, supra,* 310 Or at 518.

Petitioners here specifically alleged in their petition that mother's consent was unnecessary, because she wilfully had deserted or neglected without just and sufficient cause to provide proper care and maintenance for the children for one year before the filing of the petition, *i.e.,* the grounds for nonconsensual adoption recognized in ORS 109.324.

■■　ORS chapter 109 does not define "wilfully," "desertion," or "neglect," other than to say that "the court may

disregard incidental visitations, communications and contributions." ORS 109.324.[18] In *Moody v. Voorhies, supra,* 257 Or at 110, this court defined the term "wilful" to mean "volitional or voluntary."[19] This court, however, never has expressly defined the words "neglect without just and sufficient cause to provide proper care and maintenance." Such a definition is necessary to the disposition of this case.

Before 1957, *former* ORS 109.320, the predecessor statute to ORS 109.324, provided that a parent's consent could be dispensed with only on proof of "desertion *and* neglect * * * to provide proper care and maintenance." (Emphasis added.) Under *former* ORS 109.320, "neglect to provide proper care and maintenance" generally was understood to refer to a parent's failure to make necessary payments of money to the child or the child's caretaker for support.[20] *See, e.g., Volz v. Abelsen, supra,* 190 Or at 322-23

---

[18] In contrast to ORS chapter 109, the ORS chapter 419 termination of parental rights sections set forth relatively detailed criteria for determining parental unfitness.

[19] As used in ORS 109.324, the word "wilfully" modifies both the word "deserted" and the phrase "neglected without just and sufficient cause to provide proper care and maintenance for the child." In *Wilcox v. Alexander,* 220 Or 509, 514-15, 349 P2d 862 (1960), this court explained:

"The parties here are not certain that the word ['wilfully'] in the statute applies to both 'deserted' and 'neglected without just and sufficient cause to provide care * * *'.

"We think it is immaterial. The requirement that the nonsupport must be without 'just and sufficient cause' denotes an equivalent, if not broader, stricture than 'wilful'. No court would allow an adoption for nonsupport only unless the failure to provide was by intentional, deliberate or wilful design. The language of ORS 109.324 requiring the nonsupport to be 'without just and sufficient cause' is identical to the language of ORS 167.605 which makes it a crime to fail to support a wife or child 'without just and sufficient cause.' It is apparent, therefore, that the legislature intended that the nonsupport be of the same wilful or deliberate character as that defined in the criminal code. *State v. Francis,* 126 Or 253, 268, 269 P 878 (1928)."

One distinction between a termination of parental rights proceeding under ORS chapter 109 and a proceeding under ORS chapter 419 is that under ORS chapter 419, the parent's conduct need not be "wilful" if it results in a condition seriously detrimental to the child. *See State ex rel Juv. Dept. v. Redmond,* 17 Or App 408, 412, 522 P2d 503 (1974) (the test is whether the effect of the parent's conduct has been seriously detrimental to the child).

[20] That meaning of the phrase "neglect to provide proper care and maintenance" was consistent with the meaning of "desertion" as related to visitation and personal contacts, in that one aspect of foregoing consent in the statute referred to "contacts" and the other referred to "financial support." Traditionally, those factors

(allegation that father failed to pay child support ordered in dissolution decree held sufficient to allege neglect to provide proper care and maintenance).

In 1957, *former* ORS 109.320 was amended,[21] at which time it became, in part, ORS 109.324. As amended, the statute now provides that a parent's consent to an adoption may be dispensed with when either wilful desertion *or* neglect without just and sufficient cause to provide proper care and maintenance for the child during the statutory period is proved. *See generally Wilcox v. Alexander*, 220 Or 509, 511-14, 349 P2d 862 (1960) (discussing legislative change from "and" to "or" in the statute). Despite the 1957 amendment, however, the understanding under *former* ORS 109.320 as to the meaning of wilful neglect persisted for a short time. *See, e.g., Wilcox v. Alexander, supra*, 220 Or at 514 (referring to wilful desertion and "neglect to support"). That interpretation, however, did not expressly resurface in subsequent applications of the statute.

Over the last two decades, the Court of Appeals has held that, within the meaning of ORS 109.324, wilful neglect "does not require evidence that the respondent parent intended to abandon all parental rights." *Mead v. Roberts*, 74 Or App 238, 242, 702 P2d 1134 (1985); *Dunne v. McCashum*, 13 Or App 66, 70-71, 508 P2d 821 (1973). In *Swarthout v. Reeves*, 26 Or App 763, 768, 554 P2d 617 (1976), the Court of Appeals stated:

> "The cases do not precisely delineate the quantum or type of neglect which will satisfy the statute. Rather, they focus on 'certain minimal expressions of concern which, if present, indicate that the parent has not neglected the child.' *Dunne v. McCashum*, [*supra*, 13 Or App at 70-71]. The process ordinarily resolves to counting money payments and visits as evidence of deep human emotions and relationships which are difficult to document more meaningfully."

have been the primary focus of courts in assessing the sincerity of a parent's intent to maintain the parent-child relationship.

[21] The 1957 legislation also added ORS 109.305, which provides:

"The rule that statutes in derogation of common law are to be strictly construed does not apply to the adoption laws of this state."

*Accord Hairston v. Threets*, 105 Or App 350, 352-53, 804 P2d 1213 (1991); *DaCosta v. Adams*, 67 Or App 84, 87, 677 P2d 65 (1984). Under the Court of Appeals' approach, other non-physical contacts, such as telephone visits, gifts, birthday presents, and letters, also may be relevant. *See DaCosta v. Adams, supra,* 67 Or App at 87-88 (explaining importance of such contacts). Attempts through the judicial process to establish visitation have been held to be important, *id.,* as have inquiries made to third parties about a child's well-being, *Brown v. Taylor,* 22 Or App 219, 223, 538 P2d 1268 (1975).

In interpreting the phrase "neglected without just and sufficient cause to provide proper care and maintenance for the child" in ORS 109.324, the Court of Appeals has excused a parent's failure to visit in situations where the custodial parent prevented visitation, *Hairston v. Threets, supra,* 105 Or App at 353-55; *Brown v. Taylor, supra,* 22 Or App at 223, or where the dissolution judgment did not provide for visitation, *Swarthout v. Reeves, supra,* 26 Or App at 767.[22] Likewise, the court has excused failure to pay support in situations where the noncustodial parent has limited financial means, *Hairston v. Threets, supra,* 105 Or App at 352-53; *Chaffin v. Palumbo,* 99 Or App 312, 315, 781 P2d 1247 (1989), or where the dissolution decree did not require the noncustodial parent to pay support, *Sayre v. Whitehead,* 25 Or App 205, 208, 548 P2d 521 (1976).

We are not entirely satisfied with the Court of Appeals' "minimal expressions of concern" standard. That standard appears to us to focus on how "little" a parent may do, yet still successfully resist the involuntary termination of parental rights. It appears to define what wilful neglect *is not,* rather than what *it is.* We believe that the Court of Appeals' standard tends to place too great an emphasis on evidence that indicates "minimal" parental concern for the child, *i.e.,*

---

[22] Other cases under the "minimal expressions of concern" standard have held that the mere absence of physical contact with a child by a noncustodial parent does not necessarily show neglect, even when the absence is the result of the noncustodial parent's voluntary choice. *See, e.g., Sayre v. Whitehead,* 25 Or App 205, 222-27, 548 P2d 521 (1976) (father's lack of visitation justified when father and mother agreed that father would not have to pay child support if he did not seek visitation); *see also Brown v. Taylor,* 22 Or App 219, 222-27, 538 P2d 1268 (1975) (neglect not shown despite father's failure to see children for six years before filing of adoption petition).

some support, visitation, *etc.*, while de-emphasizing or, perhaps, even ignoring evidence that indicates an overriding lack of parental concern. We agree that money payments and personal contacts often will be the most visible and concrete expressions of parental concern; however, they are not the only evidence of parental concern, or lack thereof, that a court may examine. All the relevant evidence must be considered by the court. A proper weighing of any evidence indicating a lack of parental concern will necessarily test the sincerity of any evidence indicating the presence of parental concern.[23]

With the foregoing in mind, we interpret the "wilful neglect" ground of ORS 109.324 to impose the following standard: During the year preceding the filing of the petition for adoption, did the non-consenting parent wilfully fail to manifest substantial expressions of concern which show that the parent has a deliberate, intentional, and good faith interest in maintaining a parent-child relationship? All relevant evidence demonstrating the presence or absence of wilful neglect may be considered by the court. The court, however, may disregard incidental visitations, communications, and contributions. ORS 109.324.[24] The ultimate decision must be based on the totality of the evidence. The burden of proof rests upon the petitioner to prove by clear and convincing evidence the statutory grounds for dispensing with consent alleged in the petition. We proceed to apply that standard to the evidence in this case.[25]

The evidence in the record in this case shows that after the dissolution of mother's marriage, custody of her minor children was awarded to father. Thereafter, during visitation, mother sexually abused B.

---

[23] Even the Court of Appeals has never held that neglect may be measured *only* in terms of money payments and personal contacts. That court has stated that neglect under ORS 109.324 "is evaluated by the presence of minimal expressions of concern, which *ordinarily* are measured in terms of money payments and personal contacts." *Chaffin v. Palumbo, supra,* 99 Or App at 315 (emphasis added).

[24] "Incidental" means occurring merely by chance or without intention or calculation; being likely to ensue as a chance or minor consequence; not receiving much consideration. Webster's Third New International Dictionary 1152 (Unabridged 1961).

[25] On *de novo* review, we give due consideration to the findings of the trial judge. *Wilcox v. Alexander, supra,* 220 Or at 519; *but see Omlie v. Hunt,* 211 Or 472, 476-77, 316 P2d 528 (1957) (where trial judge did not actually see and hear the witness, the usual reason for attaching weight to the trial judge's findings did not exist).

Mother has never paid child support.[26] Petitioners argue that she could have and should have paid something. Mother, however, was not ordered to pay child support by the dissolution judgment. Moreover, we find no evidence in the record that father ever asked her to pay child support.

■ The trial court, and later on *de novo* review the Court of Appeals, both concluded that wilful neglect could not be found merely on the basis of mother's failure to pay child support. In view of petitioners' burden to show mother's wilful neglect by clear and convincing evidence, we agree with that conclusion. *See Omlie v. Hunt, supra,* 211 Or at 482 (mere failure to support, particularly when child is otherwise receiving adequate care, is not in itself proof that the neglect is "wilful," although it may be relevant evidence on that question).

As for physical contacts with the children, mother was denied physical contacts by court orders.[27] She was denied contact with B by a special condition of her criminal probation. Mother visited with D by telephone until her visits were terminated, at first by father (pursuant to his understanding of the court's several orders), and then by court order. She communicated with the children frequently by sending them letters. After her visitation was suspended, she sent them birthday presents and gifts, occasionally enclosing small sums of money. She inquired of relatives, friends, and father about the children's well-being. Moreover, she persisted through the court in trying to increase her access to the children. In many instances, she did this *pro se*. The trial court found that mother's lack of contact with the children "in and of itself [cannot] be found to be a basis to find wilful neglect."

On the other hand, the Court of Appeals disagreed with the trial court's finding on that issue, attaching "significance" to her failure to see her children. 104 Or App at 89-90.

---

[26] At the hearing, mother testified that, while she spent a lot of money trying to see her children, it would be "extremely unfair" for her to pay support when she was not permitted to see them.

[27] Notwithstanding mother's claims to the contrary, we conclude that her lack of contact with the children did not result from an unwarranted degree of constraint imposed by father. The trial court prevented mother from contacting the children because, even after she was convicted of sexually abusing B, she refused to enter treatment on the terms and conditions prescribed by the court.

Mother has been aware since September 1984 that she could restore her visitation privileges by undergoing therapy with Dr. Kjaer or, later, with Jensen at the Center. The only apparent reason for her failure to do so is her intransigent refusal to admit in treatment that she sexually abused B. Although Kjaer and Jensen might have been willing to treat mother without her admission of guilt if she was willing to enter into expensive, long-term therapy, as a practical matter Kjaer and Jensen were unwilling to treat her so long as she refused to admit that she sexually abused B.

■ Mother, however, has not refused *every* form of therapy for what the Center's report identified as her "serious psychological disorders." She only has refused that form of therapy which would require her to admit as a precondition to treatment that she sexually abused B. She maintains that she is unable to pay for the expensive, long-term therapy with Kjaer or Jensen that they might be willing to provide without her preliminary admission of guilt. Petitioners do not argue, and the record does not show, that mother has the financial resources necessary to pay for expensive, long-term therapy. Again, in view of petitioners' burden of proof, we agree with the trial court's finding that mother's lack of contact with the children cannot, in and of itself, be found to be a basis to find wilful neglect.

In *Moody v. Voorhies, supra,* 257 Or at 111, this court observed:

> "[C]ourts are bound by the language of the statutes and cannot rearrange a parent-child relationship except when the statutory criteria have been met. *Strobel v. Garrison,* 255 Or 16, 459 P2d 1001 (1969), *rehearing denied,* 255 Or 29, 464 P2d 688 (1970)."

We find the following observation of the Court of Appeals' dissenters in this case apropos:

> "There may be salutary ends that the majority seeks to obtain by terminating mother's rights. There is little emotional support for a mother who sexually abuses her child and then refuses to obtain treatment that will rehabilitate her. More is at stake here. Whether such conduct justifies termination of parental rights is a legislative decision, and we are not authorized to extend the language of the law beyond its natural meaning in order to accomplish what we think is a

just result. *Union Pac. R. R. Co. v. Anderson,* 167 Or 687, 697, 120 P2d 578 (1942)." 104 Or App at 94.

As this court explained in *State ex rel Juv. Dept. v. Geist, supra,* 310 Or at 189, concerning a termination proceeding under ORS chapter 419, *once* the statutory grounds for termination have been established by clear and convincing evidence, "[w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide [a wholesome and healthful] environment [free from fear of abuse, injury or neglect], the best interests of the child(ren) generally will require termination of that parent's parental rights."

We find that, during the year preceding the filing of the petition for adoption, mother manifested substantial expressions of concern which show that she had a deliberate, intentional, and good faith interest in maintaining a parent-child relationship with her children. She communicated with D by telephone as long as she could. She communicated with both children frequently by mail. She sent them birthday presents and gifts, occasionally sending money. She inquired of relatives, friends, and father about their well-being. She persisted through the courts in trying to increase her access to the children. Albeit not on the terms directed by the dissolution court, she sought professional help within her financial means in an effort to resolve the psychological problems that were preventing her from seeing the children. We conclude that petitioners have failed to prove by clear and convincing evidence the statutory ground of wilful neglect alleged in their petition.

As an alternative ground for affirming the trial court's decree, petitioners argue that the trial court erred in finding that mother had not wilfully deserted the children. In the Court of Appeals, petitioners challenged the trial court's finding that mother had not wilfully deserted the children. They argued that mother wilfully abandoned the children when she made an intentional, voluntary decision to deny them her presence in their lives by refusing to acknowledge and seek professional treatment for her pedophilia. Because it held that mother had wilfully neglected the children, the Court of Appeals did not specifically address this issue.

■ The term "desertion," as used in ORS 109.324, is parental conduct that evinces a settled purpose to forego, abandon, or desert all parental duties and parental rights in the child. *Moody v. Voorhies, supra,* 257 Or at 110; *see Omlie v. Hunt, supra,* 211 Or at 284 (desertion with respect to children is usually defined as conduct which evinces a settled purpose to forego all parental duties and to relinquish all parental claims to the child); *Volz v. Abelsen, supra,* 190 Or at 323 (treating "abandonment" of child as synonymous with "wilfully deserting said child"; the adoption court necessarily acquires jurisdiction through the allegations of the petition).

■ For the same reasons that petitioners did not prove wilful neglect, we conclude that petitioners have failed to prove by clear and convincing evidence the statutory ground of wilful desertion alleged in their petition.

■ Petitioners also argue that mother's parental rights should be terminated because they are subject to termination under ORS 419.523(2)(a) (extreme conduct: rape or sodomy of the child by the parent); ORS 419.523(3)(a) (conduct or condition: emotional or mental illness); and ORS 419.523(3)(b) (conduct toward any child of a sexual nature). Potentially, petitioners had all of the theories recognized in *Simons v. Smith, supra,* 229 Or at 279, including those they now raise under ORS chapter 419, available to them to prove why mother's consent to the adoption was not required.[28] ORS 109.324 contained only two of the available statutory theories. Although the law did not so limit them, petitioners chose to plead only the theories listed in ORS 109.324. They thereby limited themselves to the grounds specified in their pleadings.[29] *See Simons v. Smith, supra,* 229 Or at 287 ("In general, statutes which dispense with the consent of the natural parent require a pleading and proof of moral fault").

Because petitioners pled only the grounds listed in ORS 109.324, those were the only grounds to which mother responded. For the same reason, the trial court based its

---

[28] Whether petitioners' evidence would support other theories that mother's consent was not required is not an issue in this case.

[29] Petitioners, moreover, did not move to amend their pleadings to conform to the evidence presented at the trial as permitted by ORCP 23B; nor is it apparent from the record that such a motion would have succeeded.

findings and conclusions, and the Court of Appeals based its *de novo* review, on those grounds. We, therefore, limit our review to those grounds. ORS 19.125(4). Given the constitution's protection of the "fundamental liberty interest" of natural parents in their children, *Santosky v. Kramer, supra,* 455 US at 753; *Zockert v. Fanning, supra,* 310 Or at 528, and the effect that nonconsensual adoption has on that interest and on mother's "natural rights" to continue a parent-child relationship, *Simons v. Smith, supra,* 229 Or at 278, we are unwilling to decide this matter on statutory grounds not specifically pled and proved. *See Simons v. Smith, supra,* 229 Or at 285 (when adoption is resisted, petitioners must "plead and prove" their case by reasonably objective standards).

In summary, petitioners have not proved by clear and convincing evidence that mother either wilfully deserted or wilfully neglected without just and sufficient cause to provide proper care and maintenance for the children for one year before the filing of their petition and, therefore, that mother's consent to this adoption is not required. Accordingly, the decree of adoption must be vacated.[30]

The decision of the Court of Appeals is reversed. The circuit court's decree of adoption is vacated.

**FADELEY, J.,** concurring.

I concur fully in the reasoning and result of the court's opinion in this case. However, an additional significant reason also supports my decision to join in that result.

The pivotal point for the trial judge, and the Court of Appeals' majority, appears from the record to have been mother's failure to meet a pre-condition for therapy imposed by the second of the court-appointed professionals, Mr. Jensen of the Center for Behavioral Intervention. In 1984, mother had pled "no contest" to a misdemeanor charge of

---

[30] We do not wish to be understood as in any way criticizing petitioners. *Cf. Omlie v. Hunt, supra,* 211 Or at 486 (adoption court not authorized to take children from natural parent merely because the court believes it might be in the children's best interests to do so).

Custody of the children is not an issue in this case. Our decision here has no effect on the parties' dissolution judgment. It awarded custody of the children to father and, as modified, restricts mother's visitation and other contacts with them. Accordingly, we see no necessity to remand this case.

sexual abuse involving a child.[1] Mr. Jensen required that mother admit that she was a child abuser before he would provide therapy.[2] In a report to the trial court, that professional attributed mother's failure to meet the pre-condition to her "total denial" of the specific alleged sexual deviancy.[3]

The trial court held that the failure to currently admit deviancy, notwithstanding the professional's description of mother's intransigence as a product of "total denial," was equal to a refusal to visit the children,[4] and that a refusal to visit the children equaled wilful neglect of the children without just and sufficient cause. Thus, the court found that an adoption, without mother's consent and over her objection, was permitted by the wilful neglect exception in ORS 109.324.

The term "denial," however, can have a specialized meaning in psychiatry contrary to the meaning apparently applied by the trial court and the Court of Appeals. Because the record contains no evidence or other demonstration that mother's "total denial" is a *voluntary* act on her part, performed without what the law might view as just and sufficient cause, petitioners have not shown by clear and convincing evidence that her "denial," in the form of inability to undertake therapy with Jensen *on his terms,* demonstrates "wilful" neglect. *See Moody v. Voorhies,* 257 Or 105, 111, 475 P2d 579 (1970) ("[t]he father did not make the choice to be

---

[1] No issue is raised in the record as to what effect, if any, may be given to the mother's conviction based on her "no contest" plea. The decision below turned on mother's current "total denial" of deviancy.

[2] As noted in the court's opinion, Dr. Kjaer, previously appointed by the court, but no longer involved at the time of the adoption, indicated that therapy could commence in the presence of denial but that it would be more costly and time consuming absent an initial admission.

[3] As noted in the court's opinion, in his report, Mr. Jensen stated that visitation "should *not* depend on [mother] entering therapy." (Emphasis added.) He outlined a detailed supervised visitation schedule for use in the event the court modified its decision that mother must be treated before visitation could resume. He stated that the schedule should be followed "unless the boys expressed no interest in seeing their mother, or their behavior deteriorated significantly following visits." Jensen's assumption, and mine, is that the children will continue to live with father, a living situation where their needs are being met.

[4] The record discloses extraordinary effort by the mother to visit her children except for her manner of dealing with the issue, discussed herein, that caused the trial court to regulate visitation by her.

mentally ill" and, thus, his neglect did not satisfy the statutory exceptions for an adoption without a parent's consent).

The meaning of the term "denial," as normally employed within the disciplines of the mental health profession, is different than the meaning apparently employed by the trial court and approved by the Court of Appeals' majority. The Diagnostic and Statistical Manual of Mental Disorders 393-94 (3rd ed rev 1987) (DSM III-R) indicates that a person in a state of "denial" fails to acknowledge some aspect of external reality that would be apparent to others.[5]

In psychiatry, "denial" may connote not merely a refusal to admit something, but also an inability to admit it, frequently even a repression of the problem from conscious memory. See Taber's Medical Dictionary, 472 (16th ed 1989); Katz, Psychoanalysis, Psychiatry and Law, 156-57 (1967); Sweeney, *The Family Hero*, 51 OSB Bulletin 39 (1991) (denial described as loss of ability to express feelings because "it hurts so much"). Thus, within the discipline of the professional using the term and where the issue is the state of mind accompanying a person's omission, "total denial" is not always, or even usually, equal to a wilful "refusal." Therefore, petitioners have not shown by clear and convincing evidence mother's wilful neglect.

Unis, J., joins in this concurring opinion.

---

[5] Our cases consider DSM III-R an authority that "[a] judge can turn to * * * for assistance." *State v. Huntley*, 302 Or 418, 432, 730 P2d 1234 (1986). *See also State v. Moen*, 309 Or 45, 75, 786 P2d 111 (1990) for a similar use of DSM III-R.